1  KEVIN T. COLLINS – SBN 185427
   collinskt@gtlaw.com
2  MARC B. KOENIGSBERG – SBN 204265
   koenigsbergm@gtlaw.com
3  GREENBERG TRAURIG, LLP
   1201 K Street, Suite 1100
4  Sacramento, CA  95814-3938
   Telephone:  (916) 442-1111
5  Facsimile:  (916) 448-1709

6  Attorneys for Plaintiffs
   Animal Blood Bank, Inc., Michael W. Kaufman, and
7  Patricia M. Kaufman

8

9              UNITED STATES DISTRICT COURT

10            EASTERN DISTRICT OF CALIFORNIA

11               SACRAMENTO DIVISION

12

13  ANIMAL BLOOD BANK, INC., a California     CASE NO.
    corporation;
14  MICHAEL W. KAUFMAN, an individual; and    COMPLAINT FOR:
    PATRICIA M. KAUFMAN, an individual,

15       Plaintiffs,                          (1)   BREACH OF CONTRACT
                                              (2)   BREACH OF FIDUCIARY DUTY;
16  v.                                        (3)   BREACH OF THE IMPLIED
                                                    COVENANT OF GOOD FAITH
17  ANNE S. HALE, an individual,                    AND FAIR DEALING;
                                              (4)   MISAPPROPRIATION OF TRADE
18       Defendant.                                 SECRETS;
                                              (5)   FRAUD;
19                                            (6)   CORPORATE WASTE;
                                              (7)   ACCOUNTING;
20                                            (8)   DECLARATORY RELIEF; AND
                                              (9)   UNFAIR BUSINESS PRACTICES.
21
                                              JURY TRIAL DEMANDED
22

23

24

25

26

27

28

SAC 441,758,359 v3 001149.010200                            Case No.
─────────────────────────────────────────
                 COMPLAINT

COMPLAINT

Plaintiffs, Animal Blood Bank, Inc., Michael W. Kaufman, and Patricia M. Kaufman (collectively, "Plaintiffs"), allege as follows:

THE PARTIES

1.     Plaintiff, Animal Blood Bank, Inc. ("ABB"), is a corporation organized and existing under the laws of the State of California with its principal place of business located at 1150 Business Park Drive, #111, Dixon, Solano County, California.   ABB provides veterinarians and veterinary clinics and hospitals with blood products and blood transfusion medicine, supplies and knowledge.   ABB's Articles of Incorporation were filed with the California Secretary of State on or about December 23, 2002.   ABB has not elected statutory close corporation status pursuant to section 300 of the California Corporations Code.   ABB has not amended its Articles of Incorporation pursuant to section 204 of the California Corporations Code to provide for supermajority voting rights of the shareholders above and beyond those matters for which shareholders are granted voting rights under the California Corporations Code.

2.     Plaintiff, Michael W. Kaufman, is an individual residing in Orland, Glenn County, California.  Mr. Kaufman is one of the three members of the ABB board of directors, is the chief financial officer of ABB, and is one of ABB's three shareholders.  Mr. Kaufman owns 3,817 of ABB's 10,000 outstanding shares, or 38.17% of the total outstanding shares of ABB.

3.     Plaintiff, Patricia M. Kaufman, (together with Michael W. Kaufman, the "Kaufmans") is an individual residing in Orland, Glenn County, California.  Ms. Kaufman is one of the three members of the ABB board of directors, is the secretary of ABB, and is one of ABB's three shareholders.  Ms. Kaufman owns 3,817 of ABB's 10,000 outstanding shares, or 38.17% of the total outstanding shares of ABB.

4.     The Kaufmans are husband and wife and together own a majority (74.34%) of the shares of ABB.

5.     Defendant, Anne S. Hale ("Defendant"), is an individual residing in Stockbridge, Michigan.  Defendant is one of three members of the ABB board of directors, was the president and chief executive officer of ABB, and remains one of ABB's three shareholders.   Defendant owns 2,366 of ABB's 10,000 outstanding shares, or 23.66%, a minority share of the total outstanding shares of ABB.  Since in or around June 2008, until in or around May 2010, when she resigned, Defendant was primarily responsible for the day-to-day operations of ABB.

JURISDICTION AND VENUE

6.     This Court has diversity subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the parties are diverse and because Plaintiffs' damages exceed $75,000.

7.     This Court has personal jurisdiction over Defendant because she regularly conducted business in California with Plaintiffs and others.

8.     Venue is appropriate in this judicial district under 28 U.S.C. § 1391 because a substantial part of the acts or omissions giving rise to Plaintiffs' claims occurred here, and because Defendant is subject to personal jurisdiction in this district.

INTRADISTRICT ASSIGNMENT

9.     Assignment of this action to the Sacramento Division is proper under Civil Local Rule 3-120 in that ABB's principal place of business is in Solano County and the Kaufmans live in Glenn County, and a substantial part of the events or omissions giving rise to the claims alleged herein occurred in Solano County.

1

<p align="center">GENERAL ALLEGATIONS</p>

2

3

<p align="center">PLAN AND AGREEMENT OF MERGER</p>

4

5      10.    On or about June 3, 2008, a Plan and Agreement of Merger ("Merger

6 Agreement") was entered into by and among ABB, the Kaufmans, Defendant, Midwest Animal

7 Blood Services, Inc. ("MABS") and DCBP Fractionation Company, LLC ("DCBP").  A true

8 and correct copy of the Merger Agreement is attached and incorporated into this Complaint as

9 Exhibit "A."

10      11.    Pursuant to the Merger Agreement, a merger occurred whereby MABS and

11 DCBP merged with and into ABB, with ABB being the surviving corporation.  ABB's

12 corporate name, existence, and all its purposes, powers, and objectives continued unaffected

13 and unimpaired by the merger, and as the surviving corporation remained governed by the laws

14 of the State of California.  ABB also succeeded to all of MABS and DCBP's rights, assets,

15 liabilities and obligations in accordance with the California Corporation Code.  The merger

16 closed on or about July 16, 2008.

17      12.    The Merger Agreement provided that "the officers and directors of [ABB] on

18 the Effective Date shall be: (a) Board of Directors: (i) MICHAEL KAUFMAN; (ii) PATRICIA

19 KAUFMAN; (iii) ANNE HALE.   (b) Officers: (i) ANNE HALE, Chief Executive Officer.

20 (ii) MICHAEL KAUFMAN, Chief Financial Officer. (iii) PATRICIA KAUFMAN, Secretary."

21      13.    The Merger Agreement further required that the parties thereto enter into a

22 "Shareholder Agreement to describe the actions that shall require unanimous approval of the

23 directors and/or shareholders of ABB."

24      14.    The Merger Agreement provided that stock certificates of ABB be issued to

25 reflect the stock ownership in ABB as follows:  Michael Kaufman 3,817, Patricia Kaufman

26 3,817, and Defendant 2,366, for a total number of shares of ABB issued to shareholders of

27 10,000.

28

<p align="center">COMPLAINT</p>

15.     In the Merger Agreement, Defendant and MABS represented and warranted to Plaintiffs that the "financial information and related unaudited income statements, statements of shareholders' equity, and statements of cash flows of MABS, dated February 28, 2008, as provided to ABB, are accurate and complete in all material respects and fairly present the financial position of MABS as of the dates thereof and the results of the operations for the periods covered therein and were prepared in accordance with the usual and customary accounting practices of MABS applied on a consistent basis throughout the periods covered."

16.     In fact, the representation and warranty presented in Paragraph 3.3 of the Merger Agreement was false in so far as approximately $156,000 in total liabilities, including approximately $130,000 in accounts payable, along with other invoices dating as far back as March 2008, were not disclosed by MABS or Defendant.

17.     The Merger Agreement provides that, in any action or proceeding brought by or on behalf of any party as a result of the Merger Agreement, or to establish, maintain, or enforce any right or remedy under the Merger Agreement, the prevailing party shall be entitled to recover, in addition to costs and expenses incurred, reasonable attorneys' fees and costs.

<u>SHAREHOLDER AGREEMENT</u>

18.     On or about June 3, 2008, the Kaufmans and Defendant (collectively, "Shareholders") entered into a Shareholder Agreement.   A true and correct copy of the Shareholder Agreement is attached to this Complaint and incorporated as Exhibit "B."

19.     The Shareholder Agreement provided that "For so long as this Agreement is in effect, each of the Shareholders agrees to vote his or her shares in [ABB] for the election of the following persons as directors of [ABB]:  Anne S. Hale, Patricia Kaufman, Michael Kaufman." The Shareholder Agreement further provided that "while both Patricia Kaufman and Michael Kaufman are serving as directors, each of the Shareholders agrees to vote his or her shares in [ABB] for the election of one additional person nominated by Anne S. Hale to serve as a director of [ABB].   At any time that Patricia Kaufman and Michael Kaufman are serving as

directors, Anne S. Hale may nominate a person to serve as the fourth director of [ABB], whereupon the Shareholders shall take immediate action to appoint that nominee to the Board of Directors of [ABB]."

20.     The Shareholder Agreement further provided that the Shareholders "shall vote for the election of the officers of [ABB].  For such time as they are able and willing to serve as officers of [ABB], the Shareholders agree to elect the following persons to the following offices:  President and Chief Executive Officer:  Anne S. Hale; Secretary: Patricia Kaufman; and Chief Financial Officer:  Michael Kaufman."  The Shareholders Agreement required the officers discharge their duties as set forth in ABB's bylaws and as required by law.

21.     The Shareholder Agreement also required that ABB's Articles of Incorporation be amended to provide that none of the following actions, among others, be taken by the Shareholders without the unanimous approval of the Shareholders:

(a)     Any contract or transaction (or any series of contracts or transactions) exceeding $500.00 in amount in any calendar quarter between ABB and any one of the shareholders, directors or officers of ABB, or any entity or person owned or controlled by a shareholder, director or officer of ABB or to whom an officer or director of ABB is related by blood or marriage.

(b)     The incurring of any capital expenditure or commitment for a capital expenditure in excess of $5,000.00 in a single transaction or a series of transactions with the same vendor or for the same class of goods within any 12-month period.

(c)     Any change in the terms of employment of any officer of ABB.

(d)     Any loan by ABB to any person or persons, other than payroll advances of no more than $5,000, made in the ordinary course of business of ABB.

22.     The Shareholder Agreement is governed by California law.

23.     The Shareholder Agreement does not provide any mechanism to resolve conflicts or deadlocks between the Shareholders as they arise with respect to those actions requiring unanimous consent of the Shareholders.

### DEFENDANT ORDERS AN UNAUTHORIZED PAYMENT TO HERSELF

24.     ABB's Michigan offices and facilities are located at 4983 Bird Drive, Stockbridge, Michigan.  This property is owned by Defendant through Trianco LLC.

25.     On or about September 28, 2009, Defendant directed Beverly Dirks, an accounts payable employee at ABB, to have ABB issue a check made payable to "Anne S. Hale, Trianco LLC," in the amount of $5,591.69.  ABB Check No. 26850 was issued to "Anne S. Hale, Trianco LLC" in the amount of $5,591.69 on September 28, 2009.  A true and correct copy of ABB Check No. 26850 is attached to this Complaint and incorporated as Exhibit "C."

26.     Defendant directed that Ms. Dirks account for the payment to Defendant as "Rent" in ABB's accounting system.

27.     Defendant failed to obtain unanimous consent of the Shareholders for the payment of $5,591.69 to herself through Trianco LLC as required by the Shareholder Agreement.

### DEFENDANT ENTERS INTO AGREEMENTS WITH HAEMONETICS CORPORATION

28.     In or around June 2009, at an ABB board of directors meeting, the ABB board of directors decided that it was not in the best interests of ABB, or economical for ABB, to pursue a lyophilized platelet project that ABB had previously undertaken until Defendant could provide information regarding the cost and profitability of the project.  In or about September 2009, Defendant approached the Kaufmans and requested that ABB restart the lyophilized platelet project because Defendant had obtained grant money for the project and that the estimated cost of the project was $200,000.   Based on Defendant's representations, the Kaufmans agreed to the hiring of a consultant and the consultant's assistant for four months to create the proper foundation for the project, but requested that Defendant prepare a business plan for the project as a condition to moving forward. At no time did Defendant present a business plan associated with the lyophilized platelet project.

29.     Unbeknownst to the Kaufmans, on or about August 20, 2009, Defendant purportedly entered into an Equipment Sale and Disposable Supply Agreement with Haemonetics Corporation (the "Supply Agreement") for the purchase of products related to the lyophilized platelet project.  A true and correct copy of the Supply Agreement is attached to this Complaint and incorporated as Exhibit "D."

30.     Under the Supply Agreement, Defendant attempted to obligate ABB to purchase from Haemonetics Corporation three MCS+9000 machines, at a cost of $14,275.00 per machine, and for a total cost of $42,825.00.

31.     Also under the Supply Agreement, Defendant attempted to obligate ABB to purchase from Haemonetics Corporation over a three year period 11,700 MCS+ MNC 125 ML collection sets, at a cost of $110.00 per set.

32.     The total cost of the Supply Agreement to ABB would be approximately $1,287,000.00.

33.     Despite the Shareholder Agreement's requirement that Defendant get unanimous approval from all of ABB's shareholders before entering into an agreement such as the Supply Agreement, Defendant never requested nor received such unanimous approval and, in fact, never informed the Kaufmans of the Supply Agreement prior to Defendant's purported execution of the Supply Agreement.

34.     Based upon ABB's current use of MCS+ MNC 125 ML collection sets, which is approximately 18 per month, Defendant's purported purchase of 11,700 collection sets amounts to an approximate 54-year supply.  The shelf life for a collection kit is 3 to 4 years.

35.     On or about September 9, 2009, Defendant also purportedly entered into an Equipment Sale Agreement with Haemonetics Corporation (the "Equipment Agreement").  A true and correct copy of the Equipment Agreement is attached to this Complaint and incorporated as Exhibit "E."

36.     Under the Equipment Agreement, Defendant attempted to obligate ABB to purchase from Haemonetics Corporation a refurbished MCS+9000 machine for a total cost of $10,500.00.

37.     Despite the Shareholder Agreement's requirement that Defendant get unanimous approval from all of ABB's shareholders before entering into an agreement such as the Equipment Agreement, Defendant never requested nor received such unanimous approval and, in fact, never even informed the Kaufmans of the Equipment Agreement prior to Defendant's purported execution of the Equipment Agreement.

<u>DEFENDANT'S CONDUCT HAS CAUSED FINANCIAL ISSUES FOR ABB</u>

38.     As a result of Defendant's decision-making, conduct and omissions, ABB's financial viability is at risk.  Such decision-making, conduct and omissions have resulted in ABB having accounts payable outstanding of approximately $506,940, of which approximately $428,635 is past due.

39.     Defendant's decision-making, conduct, and omissions have also caused certain ABB vendors to demand electronic fund transfers of amounts past due and threaten to cut off services to ABB.

40.     Defendant has further caused ABB to have liabilities for unfunded 401(k) matching and safe harbor employee contributions in an amount exceeding $30,000.

41.     Defendant has also caused potential tax liabilities for income and sales tax for ABB in North Carolina, along with income tax issues for ABB involving the categorization of depreciable and inventory items as expense items.

42.     In further violation of her fiduciary duty and duty of loyalty, since her resignation, Defendant has continued to usurp corporate opportunities attempting to use Plaintiffs' confidential and proprietary information to restart the lyophilized platelet project with other entities even though she is still a shareholder and director of ABB.

<div align="center">

**FIRST CLAIM FOR RELIEF**

(Breach of Contract)

</div>

43.     Plaintiffs re-allege and incorporate herein by reference the allegations contained in paragraphs 1 through 42 of this Complaint.

44.     Plaintiffs have performed all conditions, covenants, and promises required of them by the Merger Agreement and the Shareholder Agreement.

45.     Defendant breached the Merger Agreement in so far as Defendant and MABS made false representations and warranties, including, but not limited to, in Paragraph 3.3 of the Merger Agreement, by failing to disclose approximately $156,000 in total liabilities, including approximately $130,000 in accounts payable, along with other invoices dating as far back as March 2008.

46.     Defendant breached the Shareholder Agreement by purportedly entering into the Supply Agreement and the Equipment Agreement without the unanimous approval of the Shareholders.

47.     Defendant also breached the Shareholder Agreement by ordering that a check be issued to her benefit to Trianco LLC in the amount of $5,591.69 without the unanimous approval of the Shareholders.

48.     As a direct and proximate result of Defendant's breach of the Merger Agreement and the Shareholder Agreement, Plaintiffs have suffered damages in an amount to be proven at trial.  In addition, and among other things, Defendant's actions have depressed the value of ABB, depressed the value of the Kaufmans' shares in ABB, prevented the Kaufmans from receiving the full amount of profits due to them, deteriorated ABB's goodwill, and caused an adverse effect on ABB's financial condition and results of operation.

## SECOND CLAIM FOR RELIEF

(Breach of Fiduciary Duty)

49.     Plaintiffs re-allege and incorporate herein by reference the allegations contained in paragraphs 1 through 42 of this Complaint.

50.     As a director and officer of ABB, Defendant owes ABB and its Shareholders the duty to exercise a high degree of honesty, undivided loyalty, fairness and due care in the management and administration of the business and affairs of ABB, as well as in the use and preservation of its property and assets.  Defendant's conduct described herein involves negligent, reckless and/or knowing and culpable violations of her obligations and duties as a director and officer of ABB, as well as the absence of good faith on her part because Defendant negligently, recklessly, and/or deliberately engaged in and/or omitted conduct that posed a risk or and/or caused a serious injury to ABB.

51.     Defendant breached her fiduciary duties by illegitimately abusing and exploiting her corporate powers and usurping the property and assets of ABB to secure for herself profits, monies and/or other benefits, and advantages that did not belong to her and that were contrary to ABB's best interests.  Among other things, and by way of example only, Defendant breached her fiduciary duties by (1) continuing with the lyophilized platelet project; (2) purportedly entering into the Supply Agreement and the Equipment Agreement without the unanimous approval of the Shareholders; (3)  ordering a check be issued to her benefit to Trianco LLC in the amount of $5,591.69 without the unanimous approval of the Shareholders; (4) by causing ABB to have accounts payable outstanding of approximately $506,940, of which approximately $428,635 is past due, causing certain ABB vendors to request electronic fund transfers for amounts past due and threaten to discontinue services; (5) causing ABB to incur liabilities for unfunded 401(k) matching and safe harbor employee contributions in an amount exceeding $30,000; and (6) causing potential tax liabilities in North Carolina and other tax issues.

52.     As a direct and proximate result of Defendant's breach of her fiduciary duties, Plaintiffs have been damaged in an amount to be determined in accordance with proof at trial. In addition, and among other things, Defendant's actions have depressed the value of ABB, depressed the value of the Kaufmans' shares in ABB, prevented the Kaufmans from receiving the full amount of profits due to them, deteriorated ABB's goodwill, and caused an adverse effect on ABB's financial condition and results of operation.

## THIRD CLAIM FOR RELIEF

(Breach of the Implied Covenant of Good Faith and Fair Dealing)

53.     Plaintiffs re-allege and incorporate herein by reference the allegations contained in paragraphs 1 through 42 of this Complaint.

54.     Plaintiffs and Defendant were parties to the Merger Agreement and the Shareholder Agreement as alleged herein and into which the law implies a covenant of good faith and fair dealing.

55.     This covenant requires that Defendant act with fairness and good faith to Plaintiffs, and that Defendant not take any action or fail to act to prevent Plaintiffs from reaping the benefits of the Merger Agreement and the Shareholder Agreement.  The covenant further requires Defendant to refrain from acts or omissions that cause monetary damage to Plaintiffs.

56.     Plaintiffs are informed and believe, and upon that basis allege, that in doing the acts and omissions set forth above, Defendant never intended to comply with the terms and conditions of the Merger Agreement and/or the Shareholder Agreement.

57.     Defendant, therefore, has breached the covenant of good faith and fair dealing implied in the Merger Agreement and the Shareholder Agreement by taking the actions or failing to act as alleged above.

58.     As a result of the wrongful conduct of Defendant, Plaintiffs have suffered damages in an amount to be proven at trial.  In addition, and among other things, Defendant's actions have depressed the value of ABB, depressed the value of the Kaufmans' shares in ABB,

prevented the Kaufmans from receiving the full amount of profits due to them, deteriorated ABB's goodwill, and caused an adverse effect on ABB's financial condition and results of operation.

FOURTH CLAIM FOR RELIEF

(Misappropriation of Trade Secrets)

59.     Plaintiffs re-allege and incorporate herein by reference the allegations contained in paragraphs 1 through 42 of this Complaint.

60.     ABB was in possession of trade secrets which consisted of its customer list, and a list of the businesses from whom ABB purchased its animal blood.

61.     ABB's customer list had economic value in that it contained the identifying information about ABB's customers.  The customer list was a compilation developed over decades that included names, addresses, contact persons, and contained pricing information and knowledge about each customer's particular needs.  ABB kept this list unknown to others, and took steps to keep this information secret through the following means:

(a)     Controlled access to company information through network security measures designed to limit access through complex identities and passwords;

(b)     Limited access to company servers through strict controls over web access and internal access by the same methods and additional measures for login and identity of authorized personnel;

(c)     Anti-hacker and anti-spyware software to prevent unauthorized access to web/internet access; and

(d)     Confidentiality and electronic data security agreements with all employees who are required to use company software for Order Entry and all other levels of general accounting information, including senior level staff in security of the financial information of the company.

62.     ABB's animal donor list has economic value in that it described the businesses from whom ABB purchased its animal blood.  This list contains vital information as to the owners, animal identification, health and testing status, blood draw information and use of products produced.  ABB kept this list unknown to others, and took steps to keep this information secret by insuring access to computerized data on this separate system was controlled through separate keywords, access IDs, passwords and related access information including testing and veterinary oversight documentation.  Defendant was familiar with all of the access points, contact information and animal status since she was the primary investigator and reviewer of all donor facilities under contract and in house.  It is understood that Defendant maintains all information regarding all donors and contractors of ABB in computerized and printed records in her possession.

63.     While a shareholder, board member or employee of ABB, without Plaintiffs' consent and with knowledge of her duty to ABB to maintain secrecy, Defendant misappropriated the above-described trade secrets and turned over specific customer list and the animal blood donor list to ABB's competitor, with whom Defendant is believed to have developed a business relationship in further competition with ABB and to assist in the lyophilized platelet project.

64.     As a proximate result of Defendant's unauthorized use of ABB's customer and animal blood donor lists, Plaintiffs have suffered actual damages.

65.     Plaintiffs are informed and believe and on that basis allege that Defendant's aforementioned acts were willful, oppressive, fraudulent and malicious in that Defendant misappropriated ABB's lists with the deliberate intent to injure ABB's business and improve her own position in the industry.  Plaintiffs are therefore entitled to punitive damages.

66.     Defendant's wrongful conduct in misappropriating ABB's customer and animal blood donor lists, unless and until enjoined and restrained by order of this court, will cause great and irreparable injury to Plaintiffs' business in that ABB is no longer the primary supplier of blood to its largest client, and may lose other business to the extent that it could be forced out of business before this action can be brought to trial.

67.     Plaintiffs have no adequate remedy at law for the injuries currently being suffered, or which it may suffer, in that Defendant will continue to misappropriate ABB's trade secrets and Plaintiffs would be required to maintain a multiplicity of judicial proceedings to protect its interests.

<u>FIFTH CLAIM FOR RELIEF</u>

(Fraud)

68.     Plaintiffs re-allege and incorporate herein by reference the allegations contained in paragraphs 1 through 42 of this Complaint.

69.     Prior to the execution of the Merger Agreement on or about June 3, 2008, and since then, Defendant made the following representations:

(a)     Defendant and MABS represented and warranted to Plaintiffs that the "financial information and related unaudited income statements, statements of shareholders' equity, and statements of cash flows of MABS, dated February 28, 2008, as provided to ABB, are accurate and complete in all material respects and fairly present the financial position of MABS as of the dates thereof and the results of the operations for the periods covered therein and were prepared in accordance with the usual and customary accounting practices of MABS applied on a consistent basis throughout the periods covered."

(b)     At the time of the Merger, MABS had a loan from Independent Bank in the approximate amount of $110,000.

(c)     As part of the Merger and based on Defendant's representations, ABB succeeded to all of MABS's and DCBP's patents, intellectual material, licenses, copyrights, and other intellectual property, which accounted for a significant part of the price ABB paid to Defendant in the Merger.

(d)     Defendant entered into a commercial lease with Pitt County Development Commission ("PCDC") on behalf of ABB, for which ABB paid the rent beginning in October 2009.  Defendant produced a lease showing ABB as the lessee.

COMPLAINT

(e)      Defendant represented that a grant would pay for a clean room being constructed by Filtration Technologies in the space leased from PCDC.

70.      Defendant's representations in paragraph 68 were in fact false.  The true facts are:

(a)      The representations and warranties presented in the Merger Agreement were false, including in so far as approximately $156,000 in total liabilities, including approximately $130,000 in accounts payable, along with other invoices dating as far back as March 2008, were not disclosed by MABS or Defendant.  A full accounting, as requested below, is required to learn completely the extent of Defendant's misrepresentation.

(b)      After the Merger, Defendant's loan from Independent Bank increased to approximately $150,000.

(c)      Plaintiffs have learned that Defendant never produced a complete, comprehensive list of all patents, intellectual material, licenses, copyrights, and other intellectual property that was included in the assets acquired in the Merger.

(d)      Defendant entered into a commercial lease with Pitt County Development Commission, but did so on behalf of her own company Trianco, not on behalf ABB.  Plaintiffs have received a copy of the actual lease which identifies Trianco as the lessee.

(e)      The grant that was supposed to pay for the clean room being constructed by Filtration Technologies in the spaced leased from PCDC was denied, but ABB may still be liable for the costs of construction.

71.      When Defendant made the representations in paragraph 69, she knew them to be false and made these representations with the intention to deceive and defraud Plaintiffs and to induce them to act in reliance on these representations in the manner alleged as follows.

72.      Plaintiffs, at the time Defendant made these representations, were unaware of the falsity of Defendant's representations, and believed them to be true.  In reliance on these representations, Plaintiffs were induced to and did execute the Merger Agreement, and did pay those items Defendant instructed ABB to pay as its chief operating officer.  Had Plaintiffs known the actual facts, they would not have taken such action.  Plaintiffs' reliance on

Defendant's representations was justified given them having known Defendant for many years, and the documents Defendant produced appeared to support her representations.

73.     As a proximate result of Defendant's fraudulent conduct, Plaintiffs paid for intellectual property it never received, and incurred debt and other financial obligations that rightfully belong to Defendant.

74.     Defendant's conduct consisted of intentional misrepresentations, deceit or concealment of material facts known to Defendant with the intention of depriving Plaintiffs of property or otherwise causing injury.  Such conduct was despicable and subjected Plaintiffs to cruel and unjust hardships in conscious disregard of Plaintiffs' rights, so as to justify an award of exemplary and punitive damages.

## SIXTH CLAIM FOR RELIEF

### (Corporate Waste)

75.     Plaintiffs re-allege and incorporate herein by reference the allegations contained in paragraphs 1 through 42 of this Complaint.

76.     As a result of the unlawful and wrongful conduct alleged herein, including, but not limited to, Defendant's misrepresentations and false warranties in the Merger Agreement, the Supply Agreement, Equipment Agreement, the check payable to Defendant, and the resulting deterioration of ABB's financial position, business goodwill and reputation, Defendant has caused ABB to waste valuable corporate assets to the detriment of Plaintiffs.

77.     As a direct result of Defendant's misconduct and corporate waste, Plaintiffs have been damaged in an amount to be determined in accordance with proof at trial.   In addition, and among other things, Defendant's actions have depressed the value of ABB, depressed the value of the Kaufmans' shares in ABB, prevented the Kaufmans from receiving the full amount of profits due to them, deteriorated ABB's goodwill, and caused an adverse effect on ABB's financial condition and results of operation.

SEVENTH CLAIM FOR RELIEF

(Accounting)

78.     Plaintiffs re-allege and incorporate herein by reference the allegations contained in paragraphs 1 through 42 of this Complaint.

79.     By Defendant's acts and misconduct alleged herein, Defendant breached her fiduciary duties, abused her corporate powers and usurped and/or diverted ABB's opportunities, assets and/or property.

80.     The full extent of Defendant's financial defalcations and other misconduct is not fully known, and cannot be known without a full accounting of ABB's books and records, access to which continues to be impeded by Defendant.  Accordingly, Plaintiffs request that the Court order a full accounting so that a complete determination can be made of the true nature and extent of the damages to Plaintiffs caused by Defendant.  Plaintiffs further request that they be allowed unfettered access to all of ABB's corporate books and records.

EIGHTH CLAIM FOR RELIEF

(Declaratory Relief)

81.     Plaintiffs re-allege and incorporate herein by reference the allegations contained in paragraphs 1 through 42 of this Complaint.

82.     An actual controversy has arisen and now exists between Plaintiffs and Defendant, and each of them, concerning their legal rights and duties arising out of the Shareholder Agreement's unanimous consent requirements.  Plaintiffs contend because ABB has not elected statutory close corporation status pursuant to section 300 of the California Corporations Code and has not amended its Articles of Incorporation pursuant to section 204 of the California Corporations Code to provide for supermajority voting rights of the shareholders above and beyond those matters for which shareholders are granted voting rights under the California Corporations Code, the provisions in the Shareholder Agreement requiring

unanimous approval of the Shareholders for matters over which the board of directors of a corporation has authority under the California Corporations Code are void as against public policy and in violation of the California Corporations Code.  Plaintiffs are informed and believe, and based thereon allege, that Defendant contends to the contrary.

83.     Plaintiffs desire a judicial determination of their and Defendant's rights and obligations and seek a declaration as such.

84.     By reason of the foregoing, a declaratory judgment is both necessary and proper at this time to determine the parties' legal rights and duties arising out of the Shareholder Agreement so that ABB may appropriately and lawfully conduct business.

## NINTH CLAIM FOR RELIEF

(Unfair Business Practices – California Business and Professions Code § 17200 *et seq.*)

85.     Plaintiffs re-allege and incorporate herein by reference the allegations contained in paragraphs 1 through 84 of this Complaint.

86.     California Business and Professions Code section 17200 *et seq.* prohibits unfair competition in the form of any unlawful, unfair, or fraudulent business practice.

87.     As set forth above, Defendant's conduct is unlawful, unfair and fraudulent.

88.     Accordingly, Defendant has committed unlawful, unfair or fraudulent acts as defined in California Business and Professions Code section 17200.

89.     Defendant's conduct is intentional, and Defendant is fully aware that it is illegal, unfair and fraudulent.

90.     Defendant is fully aware of the harm (both financial and otherwise) that her conduct has caused, and continues to cause, Plaintiffs.

91.     As a result of the foregoing, Plaintiffs will suffer immediate and irreparable harm, and have suffered, and will continue to suffer, harm including harm that cannot be adequately compensated by money damages.

## PRAYER

WHEREFORE, Plaintiffs pray for judgment as follows:

1.      For damages in an amount according to proof at trial;

2.      For restitution and/or disgorgement of all money, profits, compensation or property Defendant has acquired or will acquire by any wrongful or unlawful means or as a result of her breach of fiduciary duty;

3.      For the imposition of a constructive trust on all profits and/or monies Defendant wrongfully obtained;

4.      For an order requiring Defendant to show cause, if any she has, why she should not be enjoined as set forth below, during the pendency of this action;

5.      For a temporary restraining order, a preliminary injunction, and a permanent injunction, all enjoining Defendant, her agents, servants and employees, and all persons, acting under, in concert with, or for her from making any false representations to or otherwise any persons or businesses Defendant knows to have business relationships with Plaintiffs;

6.      For a further temporary restraining order, a preliminary injunction, and a permanent injunction, requiring Defendant, her agents, servants and employees, and all persons, acting under, in concert with, or for her:

(a)      to refrain from continuing the misappropriation of ABB's trade secrets by ongoing use or disclosure of ABB's lists; and

(b)      to return all copies of ABB's trade secrets, as described in this complaint;

7.      For a full accounting of the affairs of ABB and Defendant;

8.      For the Court to declare the legal rights and duties that exist between Plaintiffs and Defendant, and each of them;

9.      For exemplary and punitive damages in an amount to be determined as appropriate to punish Defendant and deter like conduct;

10.     For reasonable attorneys' fees and costs; and

11.     For such other and further relief as the Court may deem just and proper.


Dated:  August 4, 2010                              GREENBERG TRAURIG, LLP




                                        By:  /s/ Kevin T. Collins_____
                                             Kevin T. Collins
                                             Marc B. Koenigsberg
                                             Attorneys for Plaintiffs,
                                             Animal Blood Bank, Inc., Michael W.
                                             Kaufman and Patricia M. Kaufman

# EXHIBIT A

## PLAN AND AGREEMENT OF MERGER

This Plan and Agreement of Merger ("Agreement") is made as of **JUNE 3**, 2008, by and among: ANIMAL BLOOD BANK, INC., a California corporation ("ABB"); MIDWEST ANIMAL BLOOD SERVICES, INC., a Michigan corporation ("MABS") and DCBP Fractionation Company, LLC, a Michigan limited liability company ("DCBP LLC") (hereafter MABS and DCBP, LLC, collectively referred to as the "Michigan Companies"); MICHAEL KAUFMAN and PATRICIA KAUFMAN (collectively "Kaufman"); and ANNE HALE ("Hale").

## RECITALS

A.      The respective Boards of Directors of ABB and MABS and the Members of DCBP LLC, have determined that for the purpose of promoting the integration of the enterprises and enhancing their operational efficiency so as to accommodate future development and increase the competitive ability of the companies and that, it is advisable and in the best interests of each of ABB, MABS and DCBP LLC, and their respective shareholders and members to merge the Michigan companies with and into ABB upon the terms and subject to the conditions set forth in this Agreement.

B.      The Parties have determined the terms and conditions of the merger of MABS and DCBP LLC into ABB, and wish to document their agreement and understanding thereof.

NOW, THEREFORE, the parties do hereby adopt the plan and agreement of merger as set forth in this Agreement on the following terms, conditions and other provisions as follows:

## ARTICLE 1:  DEFINITIONS

1.1     In this Agreement, unless otherwise indicated:

(a)     "California Corporations Code" means California General Corporation Law, as amended.

(b)     "Effective Date" means _____, 2008.

(c)     "Effective Time" means the time of acceptance by the Secretary of State of California of the filing of the Agreement of Merger, or such later time as specified in the Agreement of Merger.

(d)     "Environmental Law" means any environmental or health and safety-related law, regulation, rule, ordinance, or by-law at the federal, state, or local level, enacted as of the date hereof.

(e)     "Hazardous Material" means and includes any hazardous waste, hazardous material, hazardous substance, petroleum product, oil, toxic substance, pollutant, contaminant, medical or veterinary waste, biohazardous material or other substance which may pose a threat to the environment or to human health or safety, as defined or regulated under any Environmental Law.

(f)      "Surviving Corporation" means ABB after consummation of the merger under this Agreement.

## ARTICLE 2:  AGREEMENT TO MERGE

2.1      Merger.          On the Effective Date, as defined in this Agreement, a merger will take place ("the Merger") whereby the Michigan Companies will be merged with and into ABB, and ABB will be the Surviving Corporation. ABB's corporate name, existence, and all its purposes, powers, and objectives will continue unaffected and unimpaired by the Merger, and as the Surviving Corporation it will be governed by the laws of the State of California and succeed to all of the Michigan Companies' rights, assets, liabilities, and obligations in accordance with the California Corporations Code.

2.2      Closing Date; Effective Time.          Unless this Agreement is earlier terminated in accordance with its terms, the Merger will be effected as soon as practicable after all the conditions established in Articles 6 and 7 of this Agreement have been satisfied or waived. Closing of the Merger (the "Closing") will be held at _____ 12:50 _____ a.m. p.m. local time, at 5958 County Rd 7, Orlando, CA5963, California, or at such other time and place as the parties may agree promptly. The time and date of Closing are called the "Closing Date", and will be the same day as the Effective Date of the Merger. On the Closing Date, the parties hereto shall cause the Merger to be consummated by filing an agreement of merger (the "Agreement of Merger") with the Secretary of State of California in accordance with the provisions of the California Corporations Code and one or more Certificates of Merger with the Michigan Department of Labor and Economic Growth, having terms consistent with this Agreement.

2.5      Articles; Bylaws.

(a)      The articles of incorporation of ABB in effect on the Effective Date will become the articles of incorporation of the Surviving Corporation. From and after the Effective Date, said articles of incorporation, as they may be duly amended from time to time, will be, and may be separately certified as, the articles of incorporation of the Surviving Corporation.

(b)      The bylaws of ABB in effect on the Effective Date will be the bylaws of the Surviving Corporation until they are thereafter duly altered, amended, or repealed.

2.6      Officers and Directors.          The officers and directors of the Surviving Corporation on the Effective Date shall be:

(a)      Board of Directors:
   (i)      MICHAEL KAUFMAN;
   (ii)     PATRICIA KAUFMAN;
   (iii)    ANNE HALE.

(b)      Officers:
   (i)      ANNE HALE, Chief Executive Officer.
   (ii)     MICHAEL KAUFMAN, Chief Financial Officer.
   (iii)    PATRICIA KAUFMAN, Secretary.

PLAN AND AGREEMENT OF MERGER          **2**

Each of the foregoing shall hold office in accordance with the provisions of applicable law, the articles of incorporation and bylaws of the Surviving Corporation, and any employment agreement, until their successors have been duly elected and qualified, in the case of directors, or their successors duly appointed, in the case of officers.

2.7     Other Agreements.  In addition to the Merger Agreement, the parties hereto each agree to execute, acknowledge and deliver, prior to, at or subsequent to the Closing, such other instruments, documents and agreements as may be necessary or reasonably requested by any party to effect the consummation of all terms of the general agreement of the parties, this Agreement and the transactions contemplated hereby.

Not by way of limitation, the parties acknowledge and agree that they have specifically discussed and agree to cooperate and work in good faith on the timely drafting, completion and execution of the following additional agreements:

(a)     Employment Agreements for each of PATRICIA KAUFMAN, MICHAEL KAUFMAN and ANNE HALE; and

(b)     Shareholder Agreement to describe the actions that shall require unanimous approval of the directors and/or shareholders of ABB.

2.8     Conversion of Shares.          On the Effective Date:

(a)     The shares of ABB common stock issued and outstanding immediately before the Effective Date will be converted into 7,600 shares of common stock of the Surviving Corporation, and all stock certificates of ABB common stock issued and outstanding immediately before the Effective Date will be surrendered and cancelled;

(b)     The shares of MABS's common stock issued and outstanding immediately before the Effective Date will be converted into 2,332 shares of common stock of the Surviving Corporation, all stock certificates of MABS will be cancelled, the stock transfer books of MABS will be closed, and thereafter no transfers of shares of MABS common stock will be made or consummated;

(c)     Each fifty percent (50%) membership interest in DCBP LLC outstanding immediately before the Effective Date will be converted into 34 shares of common stock of the Surviving Corporation; and

(d)     Stock certificates of the Surviving Corporation will be issued to properly reflect the stock ownership in the Surviving Corporation pursuant to Sections 2.6(a), (b), and (c) of this Article 2 as follows:

| | Shares of Surviving Corporation Issued Upon: | | | Total Shares of Surviving Corporation Issued to Shareholders |
| | Conversion of ABB Shares | Conversion of MABS shares | Conversion of DCBP LLC Interest | |
| --- | --- | --- | --- | --- |
| MICHAEL KAUFMAN | 3,800 | - | 17 | 3,817 |
| PATRICIA KAUFMAN | 3,800 | - | 17 | 3,817 |
| ANNE HALE | - | 2,332 | 34 | 2,366 |
| Total | | | | 10,000 |

PLAN AND AGREEMENT OF MERGER          3

## ARTICLE 3: REPRESENTATIONS AND WARRANTIES OF MABS

MABS and Hale represent and warrant to ABB and Kaufman as follows:

3.1     Organization, Standing, Qualification, and Authority.

(a)     MABS is duly organized, validly existing, and in good standing under the laws of Michigan and has the corporate power to own all of its properties and assets and to carry on its business as it is now being conducted. Neither the ownership of its property nor the conduct of its business requires MABS to be qualified to do business in any other jurisdiction other than those jurisdictions in which it is duly qualified and licensed to do business, and is otherwise in "good standing" as of the Effective Date.

(b)     MABS's sole shareholder and its sole director duly authorized the execution of this Agreement, and MABS has the corporate power and is duly authorized, subject only to the filing of a Certificate of Merger with the Michigan Department of Labor and Economic Growth, to merge MABS into ABB pursuant to this Agreement. This Agreement has been duly executed and delivered by MABS and, assuming the due authorization, execution, and delivery by ABB, constitutes the valid and binding obligation of MABS, enforceable against MABS in accordance with its terms, except as such enforceability may be subject to laws of general application related to bankruptcy, insolvency, and the relief of debtors now or hereafter in effect and rules of law governing specific performance, injunctive relief, or other equitable remedies.

(c)     The approval of all of the outstanding shares of MABS common stock is the only approval of holders of MABS capital securities required to approve the Merger.

3.2     Capital Structure.     MABS's authorized capital stock consists of 60,000 shares of MABS common stock, of which 2,000 shares are issued and outstanding. MABS's capital stock is held by Hale and no shares of MABS capital stock are held in treasury. All issued and outstanding shares have been validly issued in full compliance with all federal and state securities laws, fully paid and nonassessable, not subject to preemptive rights created by statute, the articles of incorporation, or the bylaws of MABS and issued free and clear of any similar rights under any agreement to which MABS is a party or by which it is bound, and do or will have one voting right per share. There are no outstanding subscriptions, options, rights, warrants, convertible securities, or other agreements or commitments obligating MABS to issue or to transfer from treasury any additional shares of its capital stock of any class.

3.3     Financial Statements.     The financial information and related unaudited income statements, statements of shareholders' equity, and statements of cash flows of MABS, dated February 28, 2008, as provided to ABB, are accurate and complete in all material respects and fairly present the financial position of MABS as of the dates thereof and the results of operations for the periods covered therein and were prepared in accordance with the usual and customary accounting practices of MABS applied on a consistent basis throughout the periods covered.  February 28, 2008 shall be referred to as the "Financial Information Date".

3.4     Property.

(a)     Except as provided in Schedule 3.4, MABS owns free and clear of any liens, claims, charges, options, or encumbrances all the property ("Property") reflected on its books on February 28, 2008, and all Property acquired since that date, except such Property as

PLAN AND AGREEMENT OF MERGER     4

has been disposed of in the ordinary course of business consistent with prior practices of MABS or with ABB's written consent. For purposes of this paragraph, a disposition of any single asset (other than inventories) carried on the books of MABS at more than $5,000.00 will be considered to be a disposition not in the ordinary course of business.

(b)     The leases of the real property occupied by MABS are valid and binding agreements in accordance with their terms; no default exists under any provision of any such lease, and the Merger pursuant to the Merger Agreement will not result in the termination of any such lease, require the consent of any other party to the lease, or bring into operation any other provision of the lease.

3.5     Intellectual Property.

(a)     MABS has disclosed to ABB: (i) all inventions, invention studies (whether patentable or unpatentable), designs, patents, patent applications, trademarks, trademark registrations, trademark registration applications, service marks, service mark registrations, service mark registration applications, trade names, trade secrets, secret processes, secret formulas, and technical information and know-how (hereinafter collectively called the "Intellectual Property") that MABS owns or uses (whether or not under license from third parties), together with identification of the owner of record of each item of Intellectual Property; (ii) all agreements, together with identification of all parties to such agreements, under which MABS either obtains or grants the right to use any of the items of Intellectual Property; and (iii) all opinions of counsel (whether in house or outside) on the validity, infringement, or enforceability of any patent owned or controlled by a party other than MABS that relates to any aspect of MABS's business.

(b)     Except for the liens identified in Schedule 3.4, all of the Intellectual Property is free and clear of any attachments, liens, or encumbrances, and none is subject to any outstanding order, decree, judgment, stipulation, or agreement restricting the scope of the use to the same.

(c)     There are no claims or demands of any other person, firm, or corporation pertaining to the listed Intellectual Property or license agreements, and no proceedings have been instituted, are pending, or are threatened that challenge the rights of MABS in respect to the same.

(d)     None of the Intellectual Property infringes on the rights of others, and to the best of MABS's knowledge, none of the rights pertaining to the Intellectual Property are being infringed by others.

(e)     During the last ten years neither MABS nor any predecessor of MABS has been charged with or has charged others with infringement, unfair competition, or violation of rights with respect to any patent, trademark, service mark, trade dress, trade name, or copyright, or with wrongful use of confidential information, trade secrets, or secret processes.

(f)     There are no unexpired patents necessary for the manufacture of the products of MABS or necessary to the apparatus or methods employed by MABS in manufacturing or producing its products, other than unexpired patents held by MABS or unexpired patents under which MABS is licensed.

(g)     All technical employees of MABS are required by the terms of their employment to assign to MABS all inventions or patents relating to the business of MABS or

made during the course of their employment with MABS or with the use or assistance of its facilities.

(h)     Each license agreement and each agreement regarding know-how or technical assistance is valid and binding in accordance with its terms and is in full force and effect; neither MABS nor any other party to any such agreement has breached any material provision or is in default in any material respect under the terms of that agreement; and the merger of MABS will not result in termination of any such agreement, require the consent of any party to any such agreement, or bring into operation any provision of any such agreement.

(i)     The parties acknowledge that Hale owns all rights in US Patent Pending No. US-2007-0231834-A1, commonly known as the "Gel Tech Patent". Hale has entered into an exclusive license agreement with DMS Laboratories for the commercialization of the Gel Tech Patent. MABS does not presently use the intellectual property described in the Gel Tech Patent in its business operation.

3.6     No Interests in MABS Property.     Hale is the sole member of TRIANCO, LLC, a Michigan limited liability company that owns the real estate and improvements at 4983 Bird Drive, Stockbridge, Michigan, that are occupied by MABS pursuant to a lease dated January 1, 2008. Hale has previously delivered a copy of that lease to ABB. In all other respects, no officer, director, or shareholder of MABS has any interest in any property, real or personal, tangible or intangible, including patents, trademarks, or trade names, used in or pertaining to the business of MABS.

3.7     Taxes of MABS.     MABS has timely reported and paid all federal, state and local taxes and tax penalties owed by MABS.

3.8     No Undisclosed Liabilities.     There are no liabilities of MABS other than the following:

(a)     Liabilities previously disclosed or provided for in the financial information delivered to ABB by MABS; or

(b)     Liabilities incurred in the ordinary course of business consistent with past practice since the Financial Information Date, none of which has been adverse to the business of MABS, and none of which is attributable to any period before the period covered in the financial information delivered to ABB.

3.9     Absence of Specified Changes.
Since the Financial Information Date there has not been:

(a)     any change in the business, results of operations, assets, financial condition, or manner of conducting the business of MABS other than changes in the ordinary course of business consistent with past practice, none of which has had material adverse effect on the business, results of operations, assets, financial condition, or prospects of MABS;

(b)     any damage, destruction, or loss (whether or not covered by insurance) adversely affecting any aspect of the business or operations of MABS;

(c)     except for the purchase by Hale of the MABS stock formerly owned by Valerie Cortright, any direct or indirect redemption or other acquisition by MABS of any of MABS's shares of capital stock of any class, or any declaration, setting aside, or payment of any dividend or other distribution of MABS's capital stock of any class;

PLAN AND AGREEMENT OF MERGER        6

(d)     any increase in the compensation, incentive payments, or severance payable or to become payable by MABS to any of its officers, employees, or agents, other than compensation increases granted in the ordinary course of business;

(e)     any option to purchase, or other right to acquire, stock of any class of MABS granted by MABS to any person;

(f)     any employment, bonus, severance, change of control, or deferred compensation agreement or arrangement entered into between MABS and any of its directors, officers, or other employees or consultants;

(g)     any issuance of capital stock of any class by MABS;

(h)     any sale or disposition of a material amount of assets or material interests owned or possessed by MABS, other than sales occurring in the ordinary course of business consistent with past practices and prior periods;

(i)     any indebtedness incurred by MABS for borrowed money or any commitment to borrow money entered into by MABS or any guaranty given by MABS;

(j)     any cancellation by MABS of any material indebtedness owing to MABS, or any cancellation or settlement by MABS of any material claims against others;

(k)     any change in accounting practices by MABS;

(l)     any change in method of accounting with respect to taxes, any change to a tax election, any filing of an amended tax return, any settlement or compromise of any proceeding with respect to any material tax liability;

(m)     any amendment to MABS's articles of incorporation or bylaws; or

(n)     any agreement or commitment by or on behalf of MABS to do or take any of the actions referred to in (a) through (m) above.

3.10    Permits, Licenses and Franchises.    MABS has obtained all necessary permits, licenses, franchises, and other authorizations and has complied with all laws applicable to the conduct of its business in the manner and in the areas in which business is presently being conducted; and all such permits, licenses, franchises, and authorizations are valid and in full force and effect. MABS has not engaged in any activity that would cause revocation or suspension of any such permits, licenses, franchises, or authorizations; no action or proceeding contemplating the revocation or suspension of any of them is pending or threatened; and no approvals or authorizations will be required after the consummation of the merger to permit Surviving Corporation to continue MABS's business as presently conducted.

3.11    Judgments, Decrees or Orders Restraining Business.    MABS is not a party to or subject to any judgment, decree, or order entered in any suit or proceeding brought by any governmental agency or by any other person, enjoining MABS with respect to any business practice, the acquisition of any property, or the conduct of business in any area.

3.12    Compliance with Federal, State and Local Laws.    All property and operations of MABS comply in all respects with all federal, state and local laws of the jurisdictions of MABS's property ownership and business operations.

3.13   Litigation.

(a)   There are no material claims, actions, suits, or proceedings pending or threatened: (i) against or affecting MABS or the properties or business of MABS; or (ii) that would prevent or hinder the consummation of the Merger.

(b)   MABS is not charged with violation of, or threatened with charges of violation of, or under investigation with respect to a possible violation of any provision of any federal, state, or local law or administrative ruling or regulation relating to any aspect of its business.

3.14   Insurance.   During each of the past eight fiscal years, MABS has been adequately insured by financially sound and reputable insurers with respect to risks normally insured against and in amounts normally carried by companies similarly situated. MABS presently has casualty and general liability insurance in full force and effect with limits of coverage that are adequate for the nature and the size of MABS' assets and business operation; all premiums due on such policies have been fully paid; and no notice of cancellation or termination has been received with respect to any such policy.

3.15   Labor Disputes.   MABS is not a party to any collective bargaining agreement or other contract with a labor union. No work stoppage, strike, lockout, or other labor dispute in respect to MABS is pending or threatened, and no application for certification of a collective bargaining agent is pending or threatened.

3.16   Environmental Compliance; Hazardous Materials.   To the best of its knowledge, MABS has complied in all material respects with, and has not been cited for any violation of, Environmental Laws; and no material capital expenditures will be required for compliance with any Environmental Laws. MABS has not received any written notice, claim, report, or other information regarding any violation or alleged violation of any Environmental Laws. MABS has not retained or assumed by contract or operation of law any material liability or obligation of another person under any Environmental Law. There has not been any spill, disposal, discharge, or release of any Hazardous Material into, upon, or over MABS's real property or into or upon ground or surface water on any such real property. All reports, audits, assessments, and other similar documents in possession of MABS relating to any material liability or potential material liability of MABS under any Environmental Law or to any Hazardous Material have been provided to ABB.

3.17   Contracts of MABS.

(a)   MABS has disclosed to ABB:

(i)   any oral or written employment contract or agreement with any officer, consultant, director, or employee;

(ii)   any plan or oral or written contract or agreement, providing for bonuses, pensions, options, deferred compensation, retirement payments, profit sharing, severance or the like;

(iii)   any contract or agreement with any labor union;

(iv)   any lease of machinery, equipment, or other personal property involving payment by it of annual rental in excess of $2,000.00;

PLAN AND AGREEMENT OF MERGER      8

(v)   any contract or agreement for the purchase of any materials or supplies except individual purchase orders for less than $1,000.00 incurred in the ordinary course of business;

(vi)   any contract for the purchase of equipment or any construction or other agreement involving any expenditure by MABS of more than $2,000.00;

(vii)   any instrument evidencing or related to indebtedness for borrowed money, or pursuant to which MABS is obligated or entitled to borrow money, or any instrument of guaranty;

(viii)   any license or franchise agreement either as licenser or licensee or as franchisor or franchisee (other than agreements covered by the schedule of intellectual property to be delivered pursuant to the agreement);

(ix)   any joint venture contract or arrangement or any other agreement involving a sharing of profits;

(x)   any contract or agreement for the sale or lease of its products or the furnishings of its services, or any sales agency contract, brokerage contract, distribution contract, or similar contract other than contracts made in the ordinary course of business on standard forms (copies of which standard forms have been provided to ABB);

(xi)   any contract containing covenants limiting the freedom of MABS to compete in any line of business or with any person;

(xii)   any contract or agreement for or relating to the purchase or acquisition by merger or otherwise of the business, assets, or shares of any other corporation or of any partnership or sole proprietorship (regardless of whether the purchase or acquisition has been consummated), which contract or agreement imposes continuing obligations on or grants continuing rights or benefits to MABS;

(xiii)   any insurance policy (1) held by MABS during the last three years, or (2) under which any claim could be made; and

(xiv)   any material contract or agreement not covered by any of the other items of this Section (or any other Section in this Agreement) that is not either (1) to be performed by MABS within three months from the date of the agreement, or (2) by its terms terminable by and without penalty to MABS or any successor or assign within three months from the date of the agreement.

(b)   Except as previously disclosed to ABB:

(i)   All contracts, agreements, plans, leases, and licenses are valid and binding in all material respects in accordance with their terms and are in full force and effect.

(ii)   Neither MABS nor any other party to any such contract, agreement, plan, lease, or license is in default in any material

PLAN AND AGREEMENT OF MERGER      9

respect under the terms of any such contract, agreement, plan, lease, or license.

(iii)    MABS as party to an evidence of indebtedness for borrowed money has received from the holder of such indebtedness cash equal to the principal amount of such indebtedness.

(iv)    The Merger will not require the consent of any other party to the contract, agreement, plan, lease, or license; and will not bring into operation any other provision of the contract, agreement, plan, lease, or license.

3.18    Disclosure.    No representation or warranty by MABS in this Agreement and no statement of MABS by any executive officer or other person or contained in any document, certificate, or other writing furnished by or on behalf of MABS to ABB in connection with this transaction contains or will contain any untrue statement of material fact, or omits or will omit to state any material fact necessary to make it not misleading or to fully provide the information required to be provided in the document, certificate, or other writing.

3.19    Powers of Attorney.    MABS has no powers of attorney outstanding.

3.20    No Violation of Other Instruments.    The execution and delivery of this Agreement by MABS do not, and the consummation of the Merger by MABS will not, (1) violate any provision of MABS's articles of incorporation or bylaws; (2) violate any provision of, result in the acceleration of any obligation under, result in a right of termination in another party to, or result in the imposition of any lien or encumbrance on any asset of MABS pursuant to the terms of, any mortgage, note, lien, lease, franchise, license, permit, agreement, instrument, order, arbitration award, judgment, or decree; (3) result in the termination of any agreement, license, franchise, lease, or permit to which MABS is a party or by which MABS is bound; or (4) violate or conflict with any other restriction of any kind or character to which MABS is subject. After MABS's shareholders have approved the plan of merger as set forth in this Agreement, MABS will take, or will have taken, all actions required by law or by MABS's articles of incorporation or bylaws or otherwise required or necessary to authorize the execution and delivery of this Agreement and to authorize the merger of MABS with ABB pursuant to this Agreement.

3.21    No Broker's Fees.    MABS has not incurred, nor will it incur, directly or indirectly, any liability for brokerage or finders' fees or agents' commissions or charges or any similar charges in connection with this Agreement or any transactions contemplated hereby.

## ARTICLE 4: REPRESENTATIONS AND WARRANTIES OF DCBP LLC

DCBP LLC represents and warrants to ABB as follows:

4.1    Organization, Standing, Qualification, and Authority.

(a)    DCBP LLC is duly organized, validly existing, and in good standing under the laws of Michigan and has the power to own all of its properties and assets and to carry on its business as it is now being conducted.

(b)    DCBP LLC's members have duly authorized the execution of this Agreement, and DCBP LLC has the power and is duly authorized, subject only to the filing of a

Certificate of Merger with the Michigan Department of Labor and Economic Growth, to merge DCBP LLC into ABB pursuant to this Agreement. This Agreement has been duly executed and delivered by DCBP LLC and, assuming the due authorization, execution, and delivery by ABB, constitutes the valid and binding obligation of DCBP LLC, enforceable against ABB in accordance with its terms, except as such enforceability may be subject to laws of general application related to bankruptcy, insolvency, and the relief of debtors now or hereafter in effect and rules of law governing specific performance, injunctive relief, or other equitable remedies.

(c)  The approval of all of the members of DCBP LLC is the only approval of holders of DCBP LLC membership interests required to approve the Merger.

4.2  Capital Structure.  All of the membership interests in DCBP LLC membership interests are held by Hale (50%) and Kaufman (50%). All issued and outstanding membership interests have been validly issued in full compliance with all federal and state securities laws, fully paid and nonassessable, not subject to preemptive rights created by statute, the certificate of formation, or the operating agreement of DCBP LLC and issued free and clear of any similar rights under any agreement to which DCBP LLC is a party or by which it is bound. There are no outstanding subscriptions, options, rights, warrants, convertible securities, or other agreements or commitments obligating DCBP LLC to issue any additional membership interests.

4.3  No Business Operations.  DCBP LLC has not undertaken any business operations or actions in the furtherance of its proposed business, and therefore, except as previously disclosed to ABB, or included on the attached Schedule 4.3, DCBP LLC has no:

(a)  Operational or transactional financial information or transactions;

(b)  Assets, including but not limited to intellectual property;

(c)  Except for the intercompany account payable owed by DCBP, LLC to MABS (which the parties acknowledge will be extinguished on the Effective Date), debts, obligations, or liabilities, including but not limited to tax obligations;

(d)  Judgments, decrees or orders restraining the proposed business of DCBP LLC;

(e)  No pending or threatened litigation, including but not limited action by any local, state or federal agency;

(f)  No other obligations or agreements that would prevent, inhibit, or delay the transactions under this Agreement or that would be violated by DCBP LLC's performance and compliance with the terms of theis Agreement.

4.4  No Broker's Fees.  DCBP LLC has not incurred, nor will it incur, directly or indirectly, any liability for brokerage or finders' fees or agents' commissions or charges or any similar charges in connection with this Agreement or any transactions contemplated hereby.


## ARTICLE 5:  REPRESENTATIONS AND WARRANTIES OF ABB

ABB and Kaufman represent and warrant to the Michigan Companies and Hale as follows:

5.1  Organization, Standing, Qualification, and Authority.

PLAN AND AGREEMENT OF MERGER      **11**

(a)     ABB is duly organized, validly existing, and in good standing under the laws of California and has the corporate power to own all of its properties and assets and to carry on its business as it is now being conducted.  Neither the ownership of its property nor the conduct of its business requires ABB to be qualified to do business in any other jurisdiction other than those jurisdictions in which it is duly qualified and licensed to do business, and is otherwise in "good standing" as of the Effective Date.

(b)     ABB's board of directors has duly authorized the execution of this Agreement, and ABB has the corporate power and is duly authorized, subject only to the approval of this Agreement by its shareholders and the filing of the Agreement of Merger with the Secretary of State of California, to merge the Michigan Companies into ABB pursuant to this Agreement. This Agreement has been duly executed and delivered by ABB and, assuming the due authorization, execution, and delivery by the Michigan Companies, constitutes the valid and binding obligation of ABB, enforceable against ABB in accordance with its terms, except as such enforceability may be subject to laws of general application related to bankruptcy, insolvency, and the relief of debtors now or hereafter in effect and rules of law governing specific performance, injunctive relief, or other equitable remedies.

(c)     The approval of all of the outstanding shares of ABB common stock is the only approval of holders of ABB capital securities required to approve the Merger.

5.2     Capital Structure.     ABB's authorized capital stock consists of 1,000,000 shares of ABB common stock, of which 2,000 shares are issued and outstanding. ABB's capital stock is held by Kaufman and no shares of ABB capital stock are held in treasury.  All issued and outstanding shares have been validly issued in full compliance with all federal and state securities laws, fully paid and nonassessable, not subject to preemptive rights created by statute, the articles of incorporation, or the bylaws of ABB and issued free and clear of any similar rights under any agreement to which ABB is a party or by which it is bound, and do or will have one voting right per share. There are no outstanding subscriptions, options, rights, warrants, convertible securities, or other agreements or commitments obligating ABB to issue or to transfer from treasury any additional shares of its capital stock of any class.

5.3     Financial Statements.          The financial information and related unaudited income statements, statements of shareholders' equity, and statements of cash flows of ABB provided to the Michigan Companies, are accurate and complete in all material respects and fairly present the financial position of ABB as of March 31, 2008, , the "ABB Financial Information Date", and the results of operations for the periods covered therein and were prepared in accordance with the usual and customary accounting practices of ABB applied on a consistent basis throughout the periods covered.

5.4     Property.

(a)     ABB owns free and clear of any liens, claims, charges, options, or encumbrances all the property ("Property") reflected on its books on the ABB Final Information Date, and all Property acquired since that date, except such Property as has been disposed of in the ordinary course of business consistent with prior practices of ABB or with the Michigan Companies' written consent. For purposes of this paragraph, a disposition of any single asset (other than inventories) carried on the books of ABB at more than $5,000.00 will be considered to be a disposition not in the ordinary course of business.

(b)     The leases of the real property occupied by ABB are valid and binding agreements in accordance with their terms; no default exists under any provision of any such lease, and the Merger pursuant to the Merger Agreement will not result in the termination of any such lease, require the consent of any other party to the lease, or bring into operation any other provision of the lease.

5.5     Intellectual Property.

(a)     ABB has disclosed to the Michigan Companies: (i) all inventions, invention studies (whether patentable or unpatentable), designs, patents, patent applications, trademarks, trademark registrations, trademark registration applications, service marks, service mark registrations, service mark registration applications, trade names, trade secrets, secret processes, secret formulas, and technical information and know-how (hereinafter collectively called the "Intellectual Property") that ABB owns or uses (whether or not under license from third parties), together with identification of the owner of record of each item of Intellectual Property; (ii) all agreements, together with identification of all parties to such agreements, under which ABB either obtains or grants the right to use any of the items of Intellectual Property; and (iii) all opinions of counsel (whether in house or outside) on the validity, infringement, or enforceability of any patent owned or controlled by a party other than ABB that relates to any aspect of ABB's business.

(b)     All of the Intellectual Property is free and clear of any attachments, liens, or encumbrances, and none is subject to any outstanding order, decree, judgment, stipulation, or agreement restricting the scope of the use to the same.

(c)     There are no claims or demands of any other person, firm, or corporation pertaining to the listed Intellectual Property or license agreements, and no proceedings have been instituted, are pending, or are threatened that challenge the rights of ABB in respect to the same.

(d)     None of the Intellectual Property infringes on the rights of others, and to the best of ABB's knowledge, none of the rights pertaining to the Intellectual Property are being infringed by others.

(e)     During the last ten years neither ABB nor any predecessor of ABB has been charged with or has charged others with infringement, unfair competition, or violation of rights with respect to any patent, trademark, service mark, trade dress, trade name, or copyright, or with wrongful use of confidential information, trade secrets, or secret processes.

(f)     There are no unexpired patents necessary for the manufacture of the products of ABB or necessary to the apparatus or methods employed by ABB in manufacturing or producing its products, other than unexpired patents held by ABB or unexpired patents under which ABB is licensed.

(g)     All technical employees of ABB are required by the terms of their employment to assign to ABB all inventions or patents relating to the business of ABB or made during the course of their employment with ABB or with the use or assistance of its facilities.

(h)     Each license agreement and each agreement regarding know-how or technical assistance is valid and binding in accordance with its terms and is in full force and effect; neither ABB nor any other party to any such agreement has breached any material provision or is in default in any material respect under the terms of that agreement; and the

merger of ABB will not result in termination of any such agreement, require the consent of any party to any such agreement, or bring into operation any provision of any such agreement.

5.6     No Interests in ABB Property.        Kaufman has leased to ABB the kennel facility that is located at Kaufman's home at 5958 County Road 7, Orland, California, on a month to month basis with no formal lease agreement .  Otherwise no officer, director, or shareholder of ABB has any interest in any property, real or personal, tangible or intangible, including patents, trademarks, or trade names, used in or pertaining to the business of ABB.

5.7     Taxes of ABB.        ABB has timely reported and paid all federal, state and local taxes and tax penalties owed by ABB.

5.8     No Undisclosed Liabilities.   There are no liabilities of ABB other than the following:

(a)     Liabilities previously disclosed or provided for in the financial information delivered to the Michigan Companies by ABB; or

(b)     Liabilities incurred in the ordinary course of business consistent with past practice since the Financial Information Date, none of which has been adverse to the business of ABB, and none of which is attributable to any period before the period covered in the financial information delivered to ABB. .

5.9     Absence of Specified Changes.
Since the Financial Information Date there has not been:

(a)     any change in the business, results of operations, assets, financial condition, or manner of conducting the business of ABB other than changes in the ordinary course of business consistent with past practice, none of which has had materially adverse effect on the business, results of operations, assets, financial condition, or prospects of ABB;

(b)     any damage, destruction, or loss (whether or not covered by insurance) adversely affecting any aspect of the business or operations of ABB;

(c)     any direct or indirect redemption or other acquisition by ABB of any of ABB's shares of capital stock of any class, or any declaration, setting aside, or payment of any dividend or other distribution of ABB's capital stock of any class;

(d)     any increase in the compensation, incentive payments, or severance payable or to become payable by ABB to any of its officers, employees, or agents, other than compensation increases granted in the ordinary course of business;

(e)     any option to purchase, or other right to acquire, stock of any class of ABB granted by ABB to any person;

(f)     any employment, bonus, severance, change of control, or deferred compensation agreement or arrangement entered into between ABB and any of its directors, officers, or other employees or consultants;

(g)     any issuance of capital stock of any class by ABB;

(h)     any sale or disposition of a material amount of assets or material interests owned or possessed by ABB, other than sales occurring in the ordinary course of business consistent with past practices and prior periods;

PLAN AND AGREEMENT OF MERGER       14

(i)     any indebtedness incurred by ABB for borrowed money or any commitment to borrow money entered into by ABB or any guaranty given by ABB;

(j)     any cancellation by ABB of any material indebtedness owing to ABB, or any cancellation or settlement by ABB of any material claims against others;

(k)     any change in accounting practices by ABB;

(l)     any change in method of accounting with respect to taxes, any change to a tax election, any filing of an amended tax return, any settlement or compromise of any proceeding with respect to any material tax liability;

(m)     any amendment to ABB's articles of incorporation or bylaws; or

(n)     any agreement or commitment by or on behalf of ABB to do or take any of the actions referred to in (a) through (m) above.

5.10    Permits, Licenses and Franchises.     ABB has obtained all necessary permits, licenses, franchises, and other authorizations and has complied with all laws applicable to the conduct of its business in the manner and in the areas in which business is presently being conducted; and all such permits, licenses, franchises, and authorizations are valid and in full force and effect. ABB has not engaged in any activity that would cause revocation or suspension of any such permits, licenses, franchises, or authorizations; no action or proceeding contemplating the revocation or suspension of any of them is pending or threatened; and no approvals or authorizations will be required after the consummation of the merger to permit Surviving Corporation to continue ABB's business as presently conducted.

5.11    Judgments, Decrees or Orders Restraining Business.     ABB is not a party to or subject to any judgment, decree, or order entered in any suit or proceeding brought by any governmental agency or by any other person, enjoining ABB with respect to any business practice, the acquisition of any property, or the conduct of business in any area.

5.12    Compliance with Federal, State and Local Laws.     All property and operations of ABB comply in all respects with all federal, state and local laws of the jurisdictions of ABB's property ownership and business operations.

5.13    Litigation.

(a)     There are no material claims, actions, suits, or proceedings pending or threatened: (i) against or affecting ABB or the properties or business of ABB; or (ii) that would prevent or hinder the consummation of the Merger.

(b)     ABB is not charged with violation of, or threatened with charges of violation of, or under investigation with respect to a possible violation of any provision of any federal, state, or local law or administrative ruling or regulation relating to any aspect of its business.

5.14    Insurance.     During each of the past 8 fiscal years, ABB has been adequately insured by financially sound and reputable insurers with respect to risks normally insured against and in amounts normally carried by companies similarly situated. ABB presently has casualty and general liability insurance in full force and effect with limits of coverage that are adequate for the nature and size of ABB's assets and business operations; all premiums due on such

policies have been fully paid; and no notice of cancellation or termination has been received with respect to any policy.

5.15   Labor Disputes.   ABB is not a party to any collective bargaining agreement or other contract with a labor union. No work stoppage, strike, lockout, or other labor dispute in respect to ABB is pending or threatened, and no application for certification of a collective bargaining agent is pending or threatened.

5.16   Environmental Compliance; Hazardous Materials.   To the best of its knowledge, ABB has complied in all material respects with, and has not been cited for any violation of, Environmental Laws; and no material capital expenditures will be required for compliance with any Environmental Laws. ABB has not received any written notice, claim, report, or other information regarding any violation or alleged violation of any Environmental Laws. ABB has not retained or assumed by contract or operation of law any material liability or obligation of another person under any Environmental Law. There has not been any spill, disposal, discharge, or release of any Hazardous Material into, upon, or over ABB's real property or into or upon ground or surface water on any such real property. All reports, audits, assessments, and other similar documents in possession of ABB relating to any material liability or potential material liability of ABB under any Environmental Law or to any Hazardous Material have been provided to the Michigan Companies.

5.17   Contracts of ABB.

   (a)   ABB has disclosed to the Michigan Companies:

      (i)   any oral or written employment contract or agreement with any officer, consultant, director, or employee;

      (ii)   any plan or oral or written contract or agreement, providing for bonuses, pensions, options, deferred compensation, retirement payments, profit sharing, severance or the like;

      (iii)   any contract or agreement with any labor union;

      (iv)   any lease of machinery, equipment, or other personal property involving payment by it of annual rental in excess of $2,000.00;

      (v)   any contract or agreement for the purchase of any materials or supplies except individual purchase orders for less than $1,000.00 incurred in the ordinary course of business;

      (vi)   any contract for the purchase of equipment or any construction or other agreement involving any expenditure by ABB of more than $2,000.00;

      (vii)   any instrument evidencing or related to indebtedness for borrowed money, or pursuant to which ABB is obligated or entitled to borrow money, or any instrument of guaranty;

      (viii)   any license or franchise agreement either as licenser or licensee or as franchisor or franchisee (other than agreements covered by the schedule of intellectual property to be delivered pursuant to the agreement);

      (ix)   any joint venture contract or arrangement or any other agreement involving a sharing of profits;

(x) any contract or agreement for the sale or lease of its products or the furnishings of its services, or any sales agency contract, brokerage contract, distribution contract, or similar contract other than contracts made in the ordinary course of business on standard forms (copies of which standard forms have been provided to MABS);

(xi) any contract containing covenants limiting the freedom of ABB to compete in any line of business or with any person;

(xii) any contract or agreement for or relating to the purchase or acquisition by merger or otherwise of the business, assets, or shares of any other corporation or of any partnership or sole proprietorship (regardless of whether the purchase or acquisition has been consummated), which contract or agreement imposes continuing obligations on or grants continuing rights or benefits to ABB;

(xiii) any insurance policy (1) held by ABB during the last three years, or (2) under which any claim could be made; and

(xiv) any material contract or agreement not covered by any of the other items of this Section (or any other Section in this Agreement) that is not either (1) to be performed by ABB within three months from the date of the agreement, or (2) by its terms terminable by and without penalty to ABB or any successor or assign within three months from the date of the agreement.

(b) Except as previously disclosed to the Michigan Companies:

(i) All contracts, agreements, plans, leases, and licenses are valid and binding in all material respects in accordance with their terms and are in full force and effect.

(ii) Neither ABB nor any other party to any such contract, agreement, plan, lease, or license is in default in any material respect under the terms of any such contract, agreement, plan, lease, or license.

(iii) ABB as party to an evidence of indebtedness for borrowed money has received from the holder of such indebtedness cash equal to the principal amount of such indebtedness.

(iv) The Merger will not require the consent of any other party to the contract, agreement, plan, lease, or license; and will not bring into operation any other provision of the contract, agreement, plan, lease, or license.

 5.18 Disclosure. No representation or warranty by ABB in this Agreement and no statement of ABB by any executive officer or other person or contained in any document, certificate, or other writing furnished by or on behalf of ABB to the Michigan Companies in connection with this transaction contains or will contain any untrue statement of material fact, or omits or will omit to state any material fact necessary to make it not misleading or to fully provide the information required to be provided in the document, certificate, or other writing.

5.19    Powers of Attorney.    ABB has no powers of attorney outstanding.

5.20    No Violation of Other Instruments.    The execution and delivery of this Agreement by ABB do not, and the consummation of the Merger by ABB will not, (1) violate any provision of ABB's articles of incorporation or bylaws; (2) violate any provision of, result in the acceleration of any obligation under, result in a right of termination in another party to, or result in the imposition of any lien or encumbrance on any asset of ABB pursuant to the terms of, any mortgage, note, lien, lease, franchise, license, permit, agreement, instrument, order, arbitration award, judgment, or decree; (3) result in the termination of any agreement, license, franchise, lease, or permit to which ABB is a party or by which ABB is bound; or (4) violate or conflict with any other restriction of any kind or character to which ABB is subject. After ABB's shareholders have approved the plan of merger as set forth in this Agreement, ABB will take, or will have taken, all actions required by law or by ABB's articles of incorporation or bylaws or otherwise required or necessary to authorize the execution and delivery of this Agreement and to authorize the merger of the Michigan Companies with ABB pursuant to this Agreement.

5.21    No Broker's Fees.    ABB has not incurred, nor will it incur, directly or indirectly, any liability for brokerage or finders' fees or agents' commissions or charges or any similar charges in connection with this Agreement or any transactions contemplated hereby.


## ARTICLE 6:  CONDITIONS PRECEDENT TO ABB'S OBLIGATION TO CLOSE

ABB's obligation to consummate the Merger is subject to the satisfaction or waiver, on or before the Closing Date, of the following conditions:

6.1    Performance of Acts and Undertakings of Michigan Companies.    Each of the acts and undertakings of the Michigan Companies to be performed on or before the Closing Date pursuant to the terms of this Agreement has been duly performed.

6.2    Approvals for Merger.    The Michigan Companies have furnished Buyer with copies of all resolutions, authorizations and approvals of the officers, directors, shareholders, managers and members of the Michigan Companies, as applicable, adopting, consenting and approving the Merger and this Agreement, and at least a majority of the outstanding shares of MABS and at least a majority of the membership interest of DCBP LLC have been voted for the approval of the Merger.

6.3    Continued Accuracy of Michigan Companies' Warranties. All    representations and warranties of the Michigan Companies contained in this Agreement are true in every respect as of the date of this Agreement and as of the Effective Date.

6.4    Approvals from Authorities.  ABB has received, or has satisfied itself that it will receive, in form satisfactory to ABB, all necessary approvals of the transactions contemplated by this Agreement from authorities having any jurisdiction over the business of the Michigan Companies, so that the Michigan Companies may continue to carry on their business as presently conducted after consummation of the merger; and no such approval has been withdrawn or suspended.

6.5     Consents.     All consents of other parties to the mortgages, notes, leases, franchises, agreements, licenses, and permits of the Michigan Companies necessary to permit consummation of the Merger have been obtained.

6.6     Additional Agreements.     Unless otherwise agreed or the condition waived by ABB, the following additional agreements in substantially the same forms as attached hereto as Exhibits A and B, have been executed:

     (a)     Employment Agreements for each of PATRICIA KAUFMAN, MICHAEL KAUFMAN and ANNE HALE; and

     (b)     Shareholder Agreement.

6.7     Filing of Merger Agreement.     The Agreement of Merger or a Certificate of Merger consistent therewith has been filed in the office of the Secretary of State or other office of each jurisdiction in which such filings are required for the Merger to become effective, or ABB has satisfied itself that all such filings will be or are capable of being made effective as of the Closing Date.

6.8     Termination of Outstanding Options, Conversion Rights, etc.     All outstanding rights, options, or convertible securities of the Michigan Companies have been terminated, canceled, or otherwise eliminated.

6.9     No Order, Injunction, Restraint or Proceedings.     No governmental entity shall have enacted, issued, promulgated, enforced, or entered any statute, rule, regulation, executive order, decree, injunction, or other order (whether temporary, preliminary, or permanent) that is in effect and that has the effect of making the Merger illegal or otherwise prohibiting consummation of the Merger. No temporary restraining order, preliminary or permanent injunction, or other order issued by any court of competent jurisdiction or other legal restraint or prohibition preventing consummation of the Merger shall be in effect, nor shall any proceeding brought by an administrative agency or commission or other governmental authority or instrumentality, domestic or foreign, seeking any of the foregoing be pending. There shall not have been instituted by any governmental authority or any third party any material litigation or proceedings against any of the parties to this Agreement in connection with the Merger and the other transactions contemplated by this Agreement.

## ARTICLE 7:  CONDITIONS PRECEDENT TO THE MICHIGAN COMPANIES' OBLIGATION TO CLOSE

The Michigan Companies' obligation to consummate the Merger is subject to the satisfaction or waiver on or before the Closing Date of the following conditions:

7.1     Performance of Acts and Undertakings by ABB.     Each of ABB's acts and undertakings to be performed on or before the closing date pursuant to this Agreement been performed.

7.2     Approvals for Merger.     ABB has furnished the Michigan Companies with certified copies of (1) resolutions duly adopted by the board of directors of ABB approving the execution and delivery of this Agreement and authorizing the consummation of the transactions contemplated by this Agreement, and (2) resolutions duly approved by Kaufman as the sole

PLAN AND AGREEMENT OF MERGER     **19**

shareholders of ABB, adopting and approving the plan of Merger set forth in this Agreement and this Agreement.

7.3     Continued accuracy of ABB's Warranties.   The representations and warranties of Buyer contained in this Agreement are true as of the date of this Agreement and as of the Effective Date (except for those representations and warranties that address matters only as of the date of this Agreement or any other particular date, which shall have been true as of such particular date).

7.4     Approvals from Authorities.  The Michigan Companies have received, or are satisfied that they will receive, in form satisfactory to the Michigan Companies, all necessary approvals of the transactions contemplated by this Agreement from authorities having any jurisdiction over the business of ABB, so that ABB may continue to carry on its business as presently conducted after consummation of the merger; and no such approval has been withdrawn or suspended.

7.5     Consents.     All consents of other parties to the mortgages, notes, leases, franchises, agreements, licenses, and permits of ABB necessary to permit consummation of the Merger have been obtained.

7.6     Additional Agreements.     Unless otherwise agreed or the condition waived by the Michigan Companies, the following additional agreements in substantially the same forms as attached hereto as Exhibits A and B, have been executed:

          (a)     Employment Agreements for each of PATRICIA KAUFMAN, MICHAEL KAUFMAN and ANNE HALE; and

          (b)     Shareholder Agreement.

7.7     Filing of Merger Agreement.       The Agreement of Merger or a Certificate of Merger consistent therewith has been filed in the office of the Secretary of State or other office of each jurisdiction in which such filings are required for the Merger to become effective, or the Michigan Companies are satisfied that all such filings will be or are capable of being made effective as of the Closing Date.

7.8     Termination of Outstanding Options, Conversion Rights, etc.       All outstanding rights, options, or convertible securities of ABB have been terminated, canceled, or otherwise eliminated.

7.9     No Order, Injunction, Restraint or Proceedings.       No governmental entity shall have enacted, issued, promulgated, enforced, or entered any statute, rule, regulation, executive order, decree, injunction, or other order (whether temporary, preliminary, or permanent) that is in effect and that has the effect of making the Merger illegal or otherwise prohibiting consummation of the Merger. No temporary restraining order, preliminary or permanent injunction, or other order issued by any court of competent jurisdiction or other legal restraint or prohibition preventing consummation of the Merger shall be in effect, nor shall any proceeding brought by an administrative agency or commission or other governmental authority or instrumentality, domestic or foreign, seeking any of the foregoing be pending. There shall not have been instituted by any governmental authority or any third party any material litigation or proceedings against any of the parties to this Agreement in connection with the Merger and the other transactions contemplated by this Agreement.

## ARTICLE 8: INDEMNIFICATION

8.1     Indemnification by Hale.      Hale will indemnify, defend, and hold ABB, and Kaufman, collectively and each of them individually, harmless from and against all losses, liabilities, costs, expenses, judgments, assessments, penalties, damages, deficiencies, suits, actions, claims, proceedings, demands, and causes of action, including but not limited to reasonable attorney fees, court costs, and related expenses, that were caused by, arose as a result of, or arose with respect to any of the following:

(a)     Any inaccuracy in any representation or warranty, or any breach of any representation or warranty, of MABS under this Agreement or any schedule, certificate, instrument, or other document delivered pursuant to this Agreement;

(b)     Any failure of MABS duly to perform or observe any term, provision, covenant, or agreement to be performed or observed by MABS pursuant to this Agreement, and any schedule, certificate, agreement, or other document entered into or delivered pursuant to this Agreement; or

(c)     Any inaccuracy whatsoever in the financial information provided by MABS or Hale to ABB or Kaufman;

8.2     Indemnification by Kaufman.      Kaufman, jointly and severally, will indemnify, defend, and hold Hale harmless from and against all losses, liabilities, costs, expenses, judgments, assessments, penalties, damages, deficiencies, suits, actions, claims, proceedings, demands, and causes of action, including but not limited to reasonable attorney fees, court costs, and related expenses, that were caused by, arose as a result of, or arose with respect to any of the following:

(a)     Any inaccuracy in any representation or warranty, or any breach of any representation or warranty, of ABB under this Agreement or any schedule, certificate, instrument, or other document delivered pursuant to this Agreement;

(b)     Any failure of ABB duly to perform or observe any term, provision, covenant, or agreement to be performed or observed by ABB pursuant to this Agreement, and any schedule, certificate, agreement, or other document entered into or delivered pursuant to this Agreement; or

(c)     Any inaccuracy whatsoever in the financial information provided by ABB or Kaufman to Hale or MABS;

8.3     Limitations.   In all events, a party's obligation to provide indemnification to another party under this Agreement shall be subject to the following limitations:

(a)     The obligation to indemnify shall not take effect unless and until any damages, losses and expenses that are otherwise subject to indemnification exceed $10,000.00, in which event the party(ies) entitled to indemnification will be indemnified and held harmless in full;

(b)     No party shall be required to provide indemnification for damages, losses and expenses that exceed $200,000.00 in the aggregate; and

(c)     All of the representations and warranties of the parties shall survive the closing and remain in effect for two years after the Effective Date.

## ARTICLE 9: TERMINATION OF AGREEMENT

9.1     Termination Events.  This Agreement and the transactions contemplated under this Agreement may be terminated at any time before the Effective Date:

(a)     By mutual written consent of ABB and the Michigan Companies;

(b)     By ABB if (1) there has been a material misrepresentation by the Michigan Companies or a material breach of the Michigan Companies' warranties set forth in this Agreement or in any schedule or certificate delivered pursuant to this Agreement, or (2) there has been a material breach of any of the Michigan Companies' covenants or agreements set forth in this Agreement, in the case of each of clauses (1) and (2), which breach is not curable or, if curable, is not cured within 30 days after written notice of such breach is given by ABB to the Michigan Companies or either of them;

(c)     By the Michigan Companies or either of them if (1) there has been a material misrepresentation by ABB or a material breach of warranty in ABB's warranties set forth in this Agreement, or (2) there has been a material breach of any of ABB's covenants or agreements set forth in this Agreement, in the case of each of clauses (1) and (2), which breach is not curable or, if curable, is not cured within 30 days after written notice of such breach is given by the Michigan Companies or either of them to ABB;

(d)     By ABB or the Michigan Companies or either of them if any governmental entity shall have issued an order, decree, or ruling or taken any other action permanently restraining, enjoining, or otherwise prohibiting the Merger and such order, decree, ruling, or other action shall have become final and nonappealable;

(e)     By ABB or the Michigan Companies if there shall be any action taken, or any statute, rule, regulation, or order enacted, promulgated or issued or deemed applicable to the Merger by any governmental entity, which would prohibit or restrict ABB's ownership or operation of any portion of the business of the Michigan Companies;

(f)     By ABB if it has determined that the business, assets, or financial condition of the Michigan Companies or either of them, have been materially and adversely affected, whether by reason of changes, developments, or operations in the ordinary course of business or otherwise;

(g)     By the Michigan Companies if it has determined that the business, assets, or financial condition of ABB has been materially and adversely affected, whether by reason of changes, developments, or operations in the ordinary course of business or otherwise; and

(h)     By ABB or the Michigan Companies or either of them if the Merger shall not have been consummated by September 30, 2008; provided that the party seeking to terminate this Agreement pursuant to this clause (h) has not caused such failure to close by any action or inaction constituting a breach of any of the representations, warranties, covenants, or agreements contained in this Agreement.

9.2     Right to Proceed After Termination.        In the event that this Agreement is terminated, all further obligations of ABB and of the Michigan Companies under this Agreement will terminate without further liability of ABB to the Michigan Companies or the Michigan Companies to ABB, except for any confidentiality obligations.

PLAN AND AGREEMENT OF MERGER      22

9.3     Return of Documents.        In the event of the termination of this Agreement for any reason, the parties will return to the originating party all documents, work papers, and other materials (including copies) relating to the transactions contemplated in this Agreement, whether obtained before or after execution of this Agreement. No party will use any information so obtained for any purpose and will take all practicable steps to have such information kept confidential.

9.4     Costs.  Except as provided in Section 11.13 of this Agreement, in the event of the termination of this Agreement for any reason, each party will bear its own costs and expenses, including attorney fees.

## ARTICLE 10:  COVENANT TO CONTINUE ORDINARY BUSINESS OPERATIONS

Between the date of this Agreement and the Closing Date, ABB, MABS and DCBP LLC will operate their respective businesses only in the ordinary course and in a normal manner consistent with past practices. During this period, ABB, MABS and DCBP LLC will not encumber any asset or enter into any transaction or make any commitment relating to its assets or business otherwise than in the ordinary course of its business (consistent with its prior practices), or take any action that would render inaccurate any representation or warranty contained in this Agreement or would cause a breach of any other covenant under this Agreement, without first obtaining the written consent of the other parties.

## ARTICLE 11:  MISCELLANEOUS PROVISIONS

11.1     Amendments, Waivers and Consents.  For the purposes of this Agreement and all agreements executed pursuant hereto, no course of dealing between or among any of the parties hereto and no delay on the part of any party hereto in exercising any rights hereunder or thereunder shall operate as a waiver of the rights hereof and thereof. No provision hereof may be waived otherwise than by a written instrument signed by the party or parties so waiving such covenant or other provision. No amendment to this Agreement may be made without the written consent of the parties hereto.

11.2     Governing Law.  This Agreement shall be deemed to be a contract made under, and shall be construed in accordance with, the laws of the State of California, without giving effect to conflict of laws principles thereof.

11.3     Section Headings.  The descriptive headings in this Agreement have been inserted for convenience only and shall not be deemed to limit or otherwise affect the construction of any provision thereof or hereof.

11.4     Counterparts.  This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be taken to be an original; but such counterparts shall together constitute but one and the same document.

11.5     Fees and Expenses.  Each party will bear its own expenses in connection with the negotiation and the consummation of the transactions contemplated by this Agreement and the agreements entered into in connection herewith.

11.6   Remedies; Severability.  It is specifically understood and agreed that any breach of the provisions of this Agreement by any party subject hereto will result in irreparable injury to the other parties hereto, that the remedy at law alone will be an inadequate remedy for such breach, and that, in addition to any other remedies which they may have, such other parties may enforce their respective rights by actions for specific performance (to the extent permitted by law).  Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision (or part thereof) of this Agreement shall be deemed prohibited or invalid under such applicable law, such provision (or part thereof) shall be ineffective to the extent of such prohibition or invalidity, and such prohibition or invalidity shall not invalidate the remainder of such provision or the other provisions of this Agreement.

11.7   Integration.  This Agreement, including the exhibits, documents and instruments referred to herein or therein, constitutes the entire agreement, and supersedes all other prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof.

11.8   Assignability; Binding Agreement.  This Agreement may not be assigned by any party hereto without the prior written consent of each other party hereto.  This Agreement shall be binding upon and enforceable by, and shall inure to the benefit of, the parties hereto and their respective successors, heirs, executors, administrators and permitted assigns, and no others. Notwithstanding the foregoing, nothing in this Agreement is intended to give any person not named herein the benefit of any legal or equitable right, remedy or claim under this Agreement, except as expressly provided herein.

11.9   Further Assurances.  Each party to this Agreement agrees to perform any further acts and execute and deliver any documents and instruments that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and the transactions contemplated herein.

11.10  Notices.        All notices, requests, demands, and other communications under this Agreement shall be in writing and shall be deemed to have been duly given on the date of service if served personally on the party to whom notice is to be given, or within 72 hours after mailing, if mailed to the party to whom notice is to be given, by first-class mail, registered or certified, postage prepaid, and properly addressed to the party at the address set forth below, or any other address that a party may designate by written notice to the others:

| "ABB": | "MABS": |
|---|---|
| Animal Blood Bank, Inc. | Midwest Animal Blood Services, Inc. |
| P.O. Box 1118 | 4983 Bird Drive |
| Dixon, California 95620-1118 | Stockbridge, MI 49285 |
| Attn: Patricia Kaufman, President | Attn: Anne Hale, President |
| Fax: (530) 865-1316 | Fax: (517) 851-7762 |

**"Kaufman":**
Patricia M. Kaufman
Michael W. Kaufman
5958 County Road 7
Orland, CA 95693

**"Hale":**
Anne Hale
4983 Bird Dr.
Stockbridge, MI 49285

With copies to (which shall not constitute notice):

Ernest James Krtil
Wilke, Fleury, Hoffelt, Gould & Birney, LLP
400 Capitol Mall, 22nd Floor
Sacramento, CA 95814
Fax:    (916) 442-6664

With copies to (which shall not constitute notice):

Mark J. Eby
Ellis, Eby, Conner, Smillie & Bourque, PLLC
320 N. Main St. Suite 300
Ann Arbor, MI 48104
Fax:    (734) 769-2702

**"DCBP LLC":**
DCBP Fractionation Company
4983 Bird Drive
Stockbridge, MI 49285
Fax: (517) 851-7762

11.11  Authority to Execute.    Each person executing this agreement on behalf of a corporation or other entity personally warrants and guarantees that he or she has full authority to execute this Agreement on behalf of such corporation or entity and that this Agreement is binding on the corporation or entity.

11.12  Attorneys Fees and Costs.  In any action or proceeding brought by or on behalf of any party as a result of a breach of this Agreement, or to establish, maintain, or enforce any right or remedy under this Agreement, the prevailing party shall be entitled to recover, in addition to costs and expenses incurred, reasonable attorneys' fees and costs.

*The remainder of this page is intentionally left blank*

*Signatures contained on the following page.*

In witness whereof, each of the parties has caused this Agreement to be executed as of the day and year first above written.

**"MABS"**

Midwest Animal Blood Services, Inc., a Michigan corporation

Dated: _JUNE 3_, 2008         By: _____
                                   Anne Hale, its President

**"ABB"**

Animal Blood Bank, Inc., a California corporation

Dated: _June 3_, 2008         By: _Patricia M. Kaufman_
                                   Patricia Kaufman, its President

**"DCBP LLC":**

DCBP Fractionation Company, a Michigan limited liability company

Dated: _JUNE 3_, 2008         By: _____
                                   Anne Hale, Member

Dated: _JUNE 3_, 2008         By: _Patricia M. Kaufman_
                                   Patricia Kaufman, Member

Dated: _June 3 2008_, 2008    By: _____
                                   Michael Kaufman, Member

**"Hale"**

Dated: _JUNE 3_, 2008         _____
                              Anne Hale

**"Kaufman"**

Dated: _June 3_, 2008         _Patricia M. Kaufman_
                              Patricia Kaufman

Dated: _June 3_, 2008         _____
                              Michael Kaufman

EXHIBIT B

## SHAREHOLDER AGREEMENT

**AGREEMENT**, effective June **3**, 2008, between and among Patricia Kaufman,

Michael Kaufman and Anne S. Hale (hereinafter collectively referred to as "Shareholders").

### RECITALS

A.     The Shareholders own 100% of the issued and outstanding stock of Animal Blood Bank,

   Inc., a California corporation (the "Corporation").

B.     The Shareholders have reached certain agreements regarding the management of the

   business of the Corporation that they wish to set forth in this Agreement.

   **NOW, THEREFORE**, the parties agree as follows:

   1.     <u>Certain Approvals</u>.  The Shareholders ratify, confirm and approve the currently

effective (a) Articles of Incorporation for the Corporation, as amended, a copy of which is

attached to this Agreement as Exhibit A; (b) By-Laws of the Corporation that are attached to this

Agreement as Exhibit B; and First Amendment to By-Laws of the Corporation that are attached

to this Agreement as Exhibit C.

   2.     <u>Directors</u>.  For so long as this Agreement is in effect, each of the Shareholders

agrees to vote his or her shares in the Corporation for the election of the following persons as

directors of the Corporation:

   Anne S. Hale

   Patricia Kaufman

   Michael Kaufman

In addition, while both Patricia Kaufman and Michael Kaufman are serving as directors, each of

the Shareholders agrees to vote his or her shares in the Corporation for the election of one

additional person nominated by Anne S. Hale to serve as a director of the Corporation.  At any

time that Patricia Kaufman and Michael Kaufman are serving as directors, Anne S. Hale may nominate a person to serve as the fourth director of the Corporation, whereupon the Shareholders shall take immediate action to appoint that nominee to the Board of Directors of the Corporation.

In the event that either of Patricia Kaufman or Michael Kaufman shall cease to serve as a director, such of Patricia Kaufman or Michael Kaufman remaining as a director shall have the exclusive right to nominate a person to fill the vacancy on the Board of Directors, and each of the Shareholders agree to take immediate action and to vote his or her shares in the Corporation for the election of such nominee to fill the vacancy on the Board of Directors.

3.    Officers.  The Shareholders, shall vote for the election of the officers of the Corporation.  For such time as they are able and willing to serve as officers of the Corporation, the Shareholders agree to elect the following persons to the following offices :

President and Chief Executive Officer:  Anne S. Hale

Secretary:  Patricia Kaufman

Chief Financial Officer:  Michael Kaufman

The officers shall discharge such duties as are set forth in the By-Laws of the Corporation and as are required by law.

4.    Voting Agreement.  The Shareholders agree to amend the Articles of Incorporation of the Corporation to provide that none of the following actions may be taken by them or by the Corporation without the unanimous approval of the Shareholders.  To the extent that the following actions require approval of the Board of Directors of the Corporation, the Shareholders acknowledge that they wish to restrict the Board from taking those actions and that the Shareholders shall reserve to themselves the right and authority to authorize those actions. The actions to which this paragraph applies follow:

a.      Any amendment to the Articles of Incorporation or By-Laws of the Corporation;

b.      The issuance of any capital stock or of any other instruments convertible into capital stock or of any options, warrants or other rights to purchase or otherwise acquire capital stock of the Corporation;

c.      The incurring of any liability for borrowed money exceeding $5,000.00 in principal amount, whether in a single transaction or a series of transactions with the same lender occurring within any 12-month period;

d.      Subject to the provisions of the Buy-Sell Agreement of even date, the declaration or payment of any dividends or other distributions with regard to the outstanding capital stock of the Corporation;

e.      The purchase or redemption by the Corporation of any of its capital stock;

f.      Any contract or transaction (or any series of contracts or transactions) exceeding $500.00 in amount in any calendar quarter between the Corporation and any of the Shareholders, directors or officers of the Corporation or any entity or person owned or controlled by a Shareholder, director or officer of the Corporation or to whom an officer or director of the Corporation is related by blood or marriage;

g.      Any plan or proposal to merge or consolidate the Corporation into or with another Corporation or to sell, lease, exchange or otherwise transfer all or substantially all of the property of the Corporation;

h.      The liquidation or dissolution of the Corporation;

i.      The incurring of any capital expenditure or commitment for a capital expenditure in excess of $5,000.00 in a single transaction or a series of transactions with the

same vendor or for the same class of goods, within any 12-month period;

      j.      Any change in the terms of employment of any officer of the Corporation;

      k.      Any loan by the Corporation to any person or persons, other than payroll advances of no more than $5,000, made in the ordinary course of business of the Corporation;

      l.      The establishment or modification of any retirement, incentive or benefit plan or program for the exclusive or primary benefit of any director or officer of the Corporation; and

      m.      The making of any tax election by the Corporation that will have a direct effect on the personal income tax return of any Shareholder.

      5.      <u>Representations and Warranties</u>. Each of the Shareholders represents and warrants to the Corporation that he or she has acquired his or her stock in the Corporation for investment purposes only and for his or her own account and not with a view toward distributing or reselling those shares to any other person. Each of the Shareholders acknowledges that the stock of the Corporation that is owned by him or her is subject to substantial transfer restrictions that are imposed by state and federal securities laws and that no such stock may be transferred prior to being registered for sale under state or federal securities laws or qualifying for an exemption from those registration requirements. Transfer of that stock is also restricted by a Buy-Sell Agreement of even date.

      6.      <u>Additional Actions</u>. Each of the Shareholders agrees to take such actions and execute such documents as may be necessary to give full effect to the provisions of this Agreement.

      7.      <u>Term</u>. This Agreement shall be effective upon its execution by all of the Shareholders and it shall remain in effect for an indefinite term. This Agreement may be

terminated only by the express written consent of all of the Shareholders. Provided, however, that this Agreement shall no longer be effective as to a Shareholder following the disposition by that Shareholder of all of his or her stock in the Corporation and this Agreement shall have no further force or effect if only one of the Shareholders remains as a stockholder in the Corporation. Upon the termination of this Agreement, the Shareholders agree to vote their stock in the Corporation to amend the Articles of Incorporation of the Corporation to delete the super-majority voting requirements described in Paragraph 4.

8. <u>Notice</u>. Any and all notices, or any other communication provided for herein, shall be given in writing by registered or certified mail which shall be addressed to the last known address of the person to whom it is directed. A notice shall be effective on the post-marked date, if mailed, or the date of receipt, if otherwise delivered.

9. <u>Benefit</u>. This Agreement shall be binding upon the parties, and upon their heirs, administrators, executors, successors and assigns. Further, the parties agree to execute any additional instruments which may be necessary or proper to carry out the intents and purposes of this Agreement.

10. <u>Entire Agreement</u>. This Agreement constitutes the entire understanding of the parties with respect to the subject matter hereof and supersedes entirely any prior written or oral agreements.

11. <u>Modification</u>. No change or modification of this Agreement shall be valid unless the same is in writing and signed by all of the parties.

12. <u>Invalid Provision</u>. The invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions hereof, and the invalid or unenforceable provision shall be given effect to the extent permitted by law.

13.    Waiver.  The failure by a party to this Agreement to enforce any covenant hereof or to seek any remedy available hereunder following a noncompliance with or a breach of this Agreement shall not operate as a waiver of such covenant or remedy either as to the first or any subsequent noncompliance or breach.

14.    California Law.  This Agreement shall be governed by California law, without regard to its conflict of laws principles.

15.    Gender.  The use of masculine or singular pronouns in this Agreement shall be deemed to include feminine, neuter and/or plural designations where appropriate.

**IN WITNESS WHEREOF**, the parties have signed this Agreement on the day and year first above written.

Patricia Kaufman

Michael Kaufman

Anne S. Hale

# EXHIBIT C



*111019993*
09/30/2009
7192394947

This is a LEGAL COPY of your check. You can use it the same way you would use the original check

*62902578*
*1*
*2904*
*00907*

[7240265223 09/29/2009
0160433311

26850

**ANIMAL BLOOD BANK, INC.**
P.O. BOX 1118
DIXON, CA 95620
(707) 678-7350

BANK OF AMERICA
11-35-1210

DATE 9/26/2009

AMOUNT ***5,591.69

PAY Five Thousand Five Hundred Ninety-One and 69/100******

TO THE ORDER OF
ANNE S HALE
TRIANCO LLC
4983 BIRD DRIVE
STOCKBRIDGE, MI 49285

AUTHORIZED SIGNATURE

⑈026850⑈ ⑆121000358⑆ 08578⑈10616⑈

720000966 09/29/2009
5950272481000
121103886 09/29/2009
007192394947

ENDORSE HERE

DO NOT WRITE, STAMP OR SIGN BELOW THIS LINE
RESERVED FOR FINANCIAL INSTITUTION USE

>724026522< 09/29/2009
0160433311

INDEPENDENT BANK
VILLAGE MALL

FEDERAL RESERVE BOARD OF GOVERNORS REG. CC

↓Do not endorse or write below this line↓

# EXHIBIT D

**HAEMONETICS**®

*THE* Blood Management Company

# EQUIPMENT SALE AND DISPOSABLE SUPPLY AGREEMENT

This Equipment Supply Agreement is effective this _____ day of _____, 2009 (the "Effective Date") by and between Haemonetics Corporation, a Massachusetts corporation having its principal place of business at 400 Wood Road, Braintree, Massachusetts 02184 ("Haemonetics") and **Animal Blood Resources** having its principal place of business at **4983 Bird Drive, Stockbridge, MI 49285** (hereinafter "Customer").

**Generally.**  Haemonetics will sell and Customer will buy from Haemonetics the blood collection and processing devices (the "Equipment") and disposables and the solution for use with the Equipment (together the "Disposables") as further described in the Equipment and Product and Pricing Matrix set forth below, subject to the terms and conditions of this Agreement.

**Equipment Matrix**

| Equipment Model # | Description | Quantity | Price per Unit | Serial # | Total Price |
|---|---|---|---|---|---|
| 09000-110-E | MCS+9000 | 3 | $14,275.00 | TBD | $42,825.00 |

**Product and Pricing Matrix**

| Product ID | Description | Annual Purchase Target | Total Purchase  Target | Price of Each |
|---|---|---|---|---|
| 00971-00 (vet special)* | MCS+ MNC 125 ML | 3,900 | 11,700 | $      110.00 |

**\*This item may be relabeled under a different list number.**

**Term: 36 Months**

The signatures on this page constitute acceptance of this Agreement, which includes the attached Standard Terms and Conditions.  This Agreement shall become effective when signed by both parties, as of the Effective Date referenced above.  Submission by Customer of this Agreement shall not constitute acceptance by Haemonetics of this Agreement without Haemonetics' signature below.  **IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed and delivered by their respective duly authorized officers effective the day and year first above written.

| HAEMONETICS CORPORATION | ANIMAL BLOOD RESOURCES |
|---|---|
| Signature: | Signature: |
| Mark Contardo | Name: Dr. Anne Hale |
| Vice President – Sales North American Blood Bank | Title: |
| Date: | Date: |

AUGUST 20, 2009

## STANDARD TERMS AND CONDITIONS

**ARTICLE 1 - PURCHASE OF EQUIPMENT**

1.1    **Pricing and Pricing Changes**.

1.1.1    **Price**. The purchase price of the Equipment is described in the Equipment Matrix. Pricing on future purchases of Equipment, if any, is subject to change without notice.

**ARTICLE 2 - PURCHASE OF DISPOSABLES**

2.1    **Purchase Minimums**. The Product and Pricing Matrix above sets forth the Customer's total Disposables volume commitment over the term of the Agreement ("the Total Disposables Commitment") as well as the annual Disposables volume commitment ("the Annual Disposables Commitment"). The Total Bowl Commitment plus any Equipment Fee multiplied by the initial price of bowls shall total the Customer's Total Dollar Commitment. Within six (6) weeks after each one year anniversary of this Agreement, Haemonetics will review Customer's Disposable purchases for the prior twelve (12) months and, if the Disposable purchases for any of the Disposables during the period under review fell below the Annual Purchase Commitment applicable to that Disposable, the Disposable purchase deficit may, at the election of Haemonetics, either (1) be added to the next year's total, for a new Annual Purchase Commitment to be achieved in the next contract year or (2) be invoiced to Customer and immediately due and payable. This adjustment will happen during any extended term as well. On termination of the Agreement, if the Customer has not completed its Annual Purchase Commitment for any Disposable, Haemonetics will send Customer an invoice, payable on receipt, for the balance due on Disposables not purchased. In the event that Customer closes, exchanges or sells any of its Centers, or disposes of all or substantially all of its assets by sale or otherwise, the Annual and Total Disposables Commitments shall not be waived nor diminished absent mutual agreement of the parties.

2.2    **Disposables Pricing and Pricing Changes**.

2.2.1    **Initial Prices**. The initial prices of the Disposables are contained in the Product and Pricing Matrix and shall remain in effect for the first year (12 months) of this Agreement.

2.2.2    **Pricing Changes**. After the first year, prices of Disposables may be increased annually by Haemonetics based on the CPI index CUUR0000SA0 - all items, in the case of the Solution and the PPI Index WPUSOP2000PPI - Intermediate Materials, Supplies, and Components in the case of the other Disposables, or 5% whichever is higher, by Haemonetics giving Customer written notice of a price increase at least thirty (30) days prior to the price increase becoming effective

**ARTICLE 3 – OTHER TERMS OF SALE**

3.1    **Discounts**. The Customer acknowledges that the prices of Products may represent discounts that Customer may have an obligation to report in any applicable cost report or claim to any health care payor.

3.2    **Delivery and Payment Terms**. Payment terms shall be net thirty (30) days from the date of invoice and delivery shall be FOB Haemonetics' place of shipment. Shipping prepaid and added to the invoice. Invoices that are not paid within 30 days are subject to a service charge of 1½% per month (18% per annum) on the outstanding balance. If Customer is not current on its payments and, in the judgment of Haemonetics, the commencement or continuance of production or shipment on the terms set forth in this Agreement is not justified, then Haemonetics may, at its option, discontinue filling any orders until full payment of any arrears is made, require a full or partial payment in advance, suspend its performance until such payment and any past due payments are made, and/or cancel the Customer's order(s).

3.3    **Third Party Sales by Customer**. Customer may not resell Disposables purchased from Haemonetics to any third parties.

3.4    **Security Agreement**. To secure the payment and performance of this Agreement, Customer hereby grants to Haemonetics a security interest which includes: 1) all Equipment involving any agreement between Customer and Haemonetics, including without limitation this Agreement, any disposables sale agreement, equipment lease or usage plan; 2) all Disposables purchased under any such agreements, including this Agreement; and 3) a purchase money security interest in the Disposables sold hereunder until all payments for such Disposables (including deferred payments whether or not evidenced by a note or otherwise) shall have been received in full by Haemonetics. In addition, Customer will execute any UCC financing statements supplied by Haemonetics, and agrees that Haemonetics may file such statements and perform all other acts and do all things reasonable or necessary to carry out this Security Agreement or to perfect or protect Haemonetics' security interest in the collateral.

3.5    **Taxes**. Customer shall be responsible for the payment of any taxes assessed on the transactions contemplated by this Agreement whether characterized as sales, use, gross receipts or excise taxes, fees, or assessments, or otherwise, to the extent applicable, on the purchase of Products.

**ARTICLE 4 – TERM**

The term of this Agreement shall commence on the Effective Date and shall remain in effect for the term first set forth above (the "Initial Term") and may be renewed upon the mutual agreement of the parties for successive twelve (12) month periods. The Initial Term together with any renewal terms will be referred to herein as the "Term." During the Initial Term, this Agreement may only be terminated for default. All terms and conditions of this Agreement shall remain in effect during the Term, including the provisions regarding price changes.

**ARTICLE 5 – WARRANTIES AND DEFAULT**

5.1    **Warranties**.
Haemonetics warrants that the Products manufactured by it (but not by others) when delivered FOB Haemonetics' place of shipment (a) will be of a kind and quality as described herein, (b) will be free from material defects in material and workmanship and be within Haemonetics' standard limits of tolerances and variations with respect to products of the type covered by this contract, or within such limits of tolerances and variations as Customer and Haemonetics may agree upon in writing, (c) will be manufactured in a manner consistent with current Good Manufacturing Practices promulgated and regulated by the United States Food and Drug Administration and (d) with respect to those Disposables, and only those Disposables, specifically described as being sterile and pyrogen free, shall have been sterilized in a lot from which samples showed negative findings when tested for sterility and freedom from pyrogens in the fluid passages. These warranties

shall apply for one year from the date of shipment, in the case of Equipment, and for their shelf life, in the case of Disposables.

Customer is obligated to inspect with care all Products with reasonable promptness after receipt of shipment and to make written claim for defective Products within 30 days of Customer's detection of a defect. Claims for defective Products must be verified by an authorized representative of Haemonetics.   Prior to returning any defective Products, Customer should obtain shipping instructions from Haemonetics.   Should any failure of the Products to conform to Haemonetics' warranties become apparent, Haemonetics shall, upon prompt written notice and compliance by the Customer with such instructions as Haemonetics shall give with respect to the return of defective Products, correct such nonconformity by repair or replacement of the defective Products.

Customer shall use the Products in a careful and proper manner and shall not permit any of the Products or any component thereof to be used in a manner not conforming to the Operator's and Service Manuals and as specified in Haemonetics' training.   Customer shall comply with all federal, state, municipal, and other applicable laws, ordinances, and regulations that relate to the possession, use, storage and/or maintenance of the Products.

Customer shall make payments promptly when due.   Customer shall pay timely when due all federal, state or local taxes, including taxes due from Customer and taxes collected by Customer such as sales or withholding taxes.

Each party shall comply with (1) all applicable laws, statutes, rules and regulations of any governmental authority having jurisdiction over the subject matter of this Agreement; (2) all applicable Resolutions issued by the United Nations; and (3) all applicable laws, statutes, rules and regulations of the United States of America, including, without limitation, the Arms Export Control Act, the Export Administration Act, the Foreign Corrupt Practices Act, U.S. economic sanctions regulations and U.S. anti-boycott laws.

5.2      **Limitation Of Liability And Disclaimer**
THE EXPRESS WARRANTIES MADE BY THE PARTIES IN THIS AGREEMENT ARE EXCLUSIVE AND IN LIEU OF ALL OTHER WARRANTIES, INCLUDING WARRANTIES OF QUALITY WHETHER WRITTEN, ORAL OR IMPLIED, AND ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. EACH PARTY HEREBY WAIVES ALL OTHER REMEDIES, WARRANTIES, GUARANTIES OR LIABILITIES, EXPRESS OR IMPLIED, AND ANY CLAIM FOR SPECIAL, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES, HOWEVER OCCASIONED, INCLUDING   ANY   SUCH   LOSSES   RESULTING   FROM TERMINATION OR THIRD-PARTY CLAIMS.

Customer's sole and exclusive remedy for any liability of Haemonetics of any kind is limited to the replacement (FOB Haemonetics' place of shipment) by Haemonetics of any defective Products.   In the unlikely event that such replacement is impractical or will not permit Customer to receive the benefits of the warranties contained in this Agreement, Customer may return the defective Products to Haemonetics and Haemonetics shall promptly refund to Customer the amount paid to Haemonetics in respect of the defective Products.

5.3      **Default**. Upon the occurrence of any event of material default under this Agreement, the non-defaulting party will notify the other party, in writing, of the material default and the defaulting party will have sixty (60) days to cure such material default.  Failure to meet the minimum purchase commitments hereunder shall be a material default.  In the event the default is not cured within sixty (60) days, the

non-defaulting party shall have, among other things, the right to terminate this Agreement.

5.4      The provisions of this Article 5 shall survive termination of this Agreement for any reason.

**ARTICLE 6 – CONFIDENTIALITY**

The parties acknowledge that the terms and provisions hereof, including without limitation, the prices of Product sold by Haemonetics hereunder, are confidential and the parties agree not to disclose this Agreement or any term or condition thereof to any person except as required by law.   The parties agree to treat this Agreement with confidentiality and to make the contents thereof known only to those employees who, by the nature of their jobs, are required to have such knowledge.   This provision shall not be deemed to constitute an agreement by either party not to seek and obtain review of this Agreement by their respective legal counsel.   In addition, in connection with the negotiation or performance of this Agreement, the parties may obtain proprietary information of the other party.   The parties agree to maintain as confidential any information of the other party so obtained which is either specifically designated as confidential or which a reasonable person would understand to be confidential.

The provisions of this Article 6 shall survive termination of this Agreement for any reason unless disclosure is otherwise required by law.

**ARTICLE 7 -        MISCELLANEOUS**

7.1      **Successors and Assigns**.   In the event Customer experiences a "change in control," Customer shall be required to assign this Agreement, subject to the consent of Haemonetics, to such successor to Customer's assets or business, if applicable, and/or take such action and do all things necessary to vest the rights and obligations of Customer in this Agreement in and to Customer's successor. A "change in control" shall be deemed to have occurred (i) whenever Customer becomes the affiliate of a person or entity who was not the affiliate of Customer on the effective date of this Agreement, (ii) upon any sale, exchange or other transfer of all or substantially all of Customer's assets to an unaffiliated third party, including by merger, consolidation, or otherwise, or (iii) a sale, exchange or other transfer of all or substantially all of the business activities of Customer involved in this Agreement, including by merger, consolidation, or otherwise.   Except as herein provided, neither party shall have the right to assign this Agreement without the advance written consent of the other party, which shall not be unreasonably withheld.   This Agreement shall be binding upon and inure to the benefit of the parties thereto and their respective successors and permitted assigns,

7.2      **No Waiver**.   None of the terms of this Agreement shall be deemed to be waived by any party unless such waiver is in writing duly executed by the party to be charged with such waiver and such writing recites specifically that it is a waiver of the terms of this Agreement. The waiver by either party of any breach of any Agreement, warranty or covenant contained in this Agreement shall not be construed to act as a waiver of any subsequent breach.  The failure or delay of either party to exercise any right, power or remedy shall not operate as a waiver thereof, and all rights, powers and remedies shall continue in full force and effect.  All rights, powers and remedies of both parties provided for in this Agreement are cumulative and non-exclusive, except as otherwise expressly provided.

**7.3**  **No Invalidity**.  Unenforceability or invalidity of any one or more provision hereof shall not render any other provision herein contained unenforceable or invalid.

**7.4**  **Entire Agreement/Amendments**.  This Agreement constitutes the entire agreement between the parties relating to the subject matter herein and all prior proposals, understandings, course of conduct and writings by and between the parties and relating to the subject matter herein are superseded.  In the event of a conflict between the provisions of any other document, including without limitation any purchase order, and the terms of this Agreement, the terms of this Agreement shall govern and the terms of this Agreement may only be amended in a writing duly executed by all parties to this Agreement which specifically states that it is an amendment to this Agreement

**7.5**  **Notices**.  Any notice required or contemplated by this Agreement and any request made by Customer shall be effective only if such notice or request is in writing, duly delivered, if delivered in person or sent by telegram, telex or facsimile transmission or sent by registered mail, as follows:

| If to Haemonetics: | Mark Contardo<br>VP – Sales North American Blood Bank<br>Haemonetics Corporation<br>400 Wood Road<br>Braintree, Massachusetts 02184<br><br>cc: Alicia Lopez<br>Vice President and General Counsel<br>Haemonetics Corporation<br>400 Wood Road<br>Braintree, Massachusetts 02184 |
| --- | --- |
|  |  |
| If to Customer: | Attn:  Dr. Anne Hale<br>Title: |

| |
| --- |
| Animal Blood Resources<br>4983 Bird Drive<br>Stockbridge, MI  49285 |

**7.6**  **Arbitration**.  Any claim or dispute arising out of, or relating to, this Agreement or any alleged breach thereof, including without limitation any claim concerning the interpretation or validity of this Agreement shall be determined, solely and exclusively, by arbitration upon written demand by a party.  Each party shall bear its own expenses of the arbitration, including its own attorneys' fees, unless the arbitration award states that the expenses shall be otherwise assessed.  Notwithstanding the foregoing, in the event both parties hereto are named as defendants by an arms length third party plaintiff asserting a claim against both Haemonetics and Customer, then and in such event, either Haemonetics or Customer may seek the resolution of their respective rights and obligations, arising from such claim in said proceedings.

The provisions of this Article 7.6 shall survive termination of this Agreement for any reason.

**7.7**  **Governing Law:**  This Agreement and all transactions contemplated by this Agreement shall be governed by, and construed and enforced in accordance with the laws of the Commonwealth of Massachusetts.

**7.8**  **Force Majeure Events**.  Failure of either party to perform its obligations under this Agreement shall not subject such party to any liability to the other party if such failure is caused by any cause beyond the reasonable control of such nonperforming party, including, but not limited to, acts of God, fire, explosion, flood, drought, war, riot, sabotage, terrorism, embargo, strikes or other labor trouble or a national health emergency.

# EXHIBIT E

# EQUIPMENT SALE AGREEMENT

This Equipment Supply Agreement is effective this _____ day of _____, 2009 (the "Effective Date") by and between Haemonetics Corporation, a Massachusetts corporation having its principal place of business at 400 Wood Road, Braintree, Massachusetts 02184 ("Haemonetics") and **Animal Blood Resources, Intl.** having its principal place of business at **4983 Bird Drive, Stockbridge, MI 49285** (hereinafter "Customer").

<u>Generally</u>.  Haemonetics will sell and Customer will buy from Haemonetics the blood collection and processing devices (the "Equipment") as further described in the Product and Pricing Matrix set forth below, subject to the terms and conditions of this Agreement.

## Product and Pricing Matrix

| <u>Equipment Model #</u> | <u>Description</u> | <u>Quantity</u> | <u>Price per Unit</u> | <u>Serial #</u> | <u>Total Price</u> |
|---|---|---|---|---|---|
| 09000-110-E | Refurbished MCS®+ 9000 | 1 | $10,500.00 | 07E275-01 | $10,500.00 |

The signatures on this page constitute acceptance of this Agreement, which includes the attached Standard Terms and Conditions.  This Agreement shall become effective when signed by both parties, as of the Effective Date referenced above.  Submission by Customer of this Agreement shall not constitute acceptance by Haemonetics of this Agreement without Haemonetics' signature below.  **IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed and delivered by their respective duly authorized officers effective the day and year first above written.

| HAEMONETICS CORPORATION | ANIMAL BLOOD RESOURCES, INTL. |
|---|---|
| Signature: | Signature: |
| Mark Contardo | Attn: |
| Vice President – Sales North American Blood Bank | Title: |
| Date: | Date: |

# HAEMONETICS

*THE* Blood Management Company

## STANDARD TERMS AND CONDITIONS

### ARTICLE 1 - PURCHASE OF EQUIPMENT

1.1     **Pricing and Pricing Changes.**

1.1.1     **Price.**  The purchase price of the Equipment is described in the Product and Pricing Matrix.  Pricing on future purchases of Equipment, if any, is subject to change without notice.

1.2     **Delivery and Payment Terms.**  Payment terms shall be net thirty (30) days from date of invoice and delivery shall be FOB Haemonetics' place of shipment.  Invoices that are not paid within 30 days are subject to a service charge of 1 ½% per month (18% per annum) on the outstanding balance.

1.3     **Security Agreement.**  To secure the payment and performance of this Agreement, Customer hereby grants to Haemonetics a security interest which includes: 1) all Equipment involving any agreement between Customer and Haemonetics, including without limitation this Agreement, any disposables sale agreement, equipment lease or usage plan; and 2) all Disposables purchased under any such agreements.  In addition, Customer will execute any UCC financing statements supplied by Haemonetics, and agrees that Haemonetics may file such statements and perform all other acts and do all things reasonable or necessary to carry out this Security Agreement or to perfect or protect Haemonetics' security interest in the collateral.

1.4     **Taxes.**  Customer shall be responsible for the payment of any taxes assessed on the transactions contemplated by this Agreement whether characterized as sales, use, gross receipts or excise taxes, fees, or assessments, or otherwise, to the extent applicable, on the purchase of Equipment.  Immediately upon request by Haemonetics, Customer shall provide all applicable tax exemption certificates.

1.5     **Freight Charges.**  Freight charges for initial installation of Equipment at a Customer location and for movement of Equipment between Customer locations shall be borne by Customer.

### ARTICLE 2 – WARRANTIES AND DEFAULT

2.1     **Warranties.**  Haemonetics warrants that the Equipment manufactured by it (but not by others) when delivered FOB Haemonetics' place of shipment (a) will be of a kind and quality as described herein, (b) will be free from material defects in material and workmanship and be within Haemonetics' standard limits of tolerances and variations with respect to products of the type covered by this Agreement, or within such limits of tolerances and variations as Customer and Haemonetics may agree upon in writing, and (c) will be manufactured in a manner consistent with current Good Manufacturing Practices promulgated and regulated by the United States Food and Drug Administration.  These warranties shall apply for one year from the date of shipment of the Equipment.

Customer is obligated to inspect the Equipment with care with reasonable promptness after receipt of shipment and to make written claim for defective Equipment within 30 days of Customer's detection of a defect.  Claims for defective Equipment must be verified by an authorized representative of Haemonetics.  Prior to returning any defective Equipment, Customer shall obtain shipping instructions from

Haemonetics.  Should any failure of the Equipment to conform to Haemonetics' warranties become apparent, Haemonetics shall, upon prompt written notice and compliance by the Customer with such instructions as Haemonetics shall give with respect to the return of defective Equipment, correct such nonconformity by repair or replacement of the defective Equipment.

Customer shall use the Equipment in a careful and proper manner and shall not permit the Equipment, or any component thereof or disposables used therewith to be used in a manner not conforming to the Operator's and Service Manuals and as specified in Haemonetics' training.  Customer shall comply with all federal, state, municipal, and other applicable laws, ordinances, and regulations that relate to the possession, use, storage and/or maintenance of the Equipment.  Only Haemonetics authorized disposable products may be used with the Equipment and use of any non-Haemonetics authorized disposable products with the Equipment will void this warranty.  Customer will indemnify and hold Haemonetics harmless from any claims arising from the use of unauthorized disposable products with the Equipment.

Customer shall make payments promptly when due.  Customer shall pay timely when due all federal, state or local taxes, including taxes due from Customer and taxes collected by Customer such as sales or withholding taxes.

Each party shall comply with (1) all applicable laws, statutes, rules and regulations of any governmental authority having jurisdiction over the subject matter of this Agreement; (2) all applicable Resolutions issued by the United Nations; and (3) all applicable laws, statutes, rules and regulations of the United States of America, including, without limitation, the Arms Export Control Act, the Export Administration Act, the Foreign Corrupt Practices Act, U.S. economic sanctions regulations, U.S. anti-boycott laws and any applicable laws, regulations or rules respecting Anti-Kickback or Medicare Fraud and Abuse..

2.2

**Limitation Of Liability And Disclaimer**

**THE EXPRESS WARRANTIES MADE BY THE PARTIES IN THIS AGREEMENT ARE EXCLUSIVE AND IN LIEU OF ALL OTHER WARRANTIES, INCLUDING WARRANTIES OF QUALITY WHETHER WRITTEN, ORAL OR IMPLIED, AND ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. EACH PARTY HEREBY WAIVES ALL OTHER REMEDIES, WARRANTIES, GUARANTIES OR LIABILITIES, EXPRESS OR IMPLIED, AND ANY CLAIM FOR SPECIAL, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES, HOWEVER OCCASIONED, INCLUDING ANY SUCH LOSSES RESULTING FROM TERMINATION OR THIRD-PARTY CLAIMS.**

Customer's sole and exclusive remedy for any liability of Haemonetics of any kind is limited to the replacement (FOB Haemonetics' place of shipment) by Haemonetics of any defective Equipment.

2.3     The provisions of this Article 2 shall survive termination of this Agreement for any reason.

### ARTICLE 3 -- CONFIDENTIALITY

The parties acknowledge that the terms and provisions hereof, including without limitation, the prices of Equipment sold by

Haemonetics hereunder, are confidential and the parties agree not to disclose this Agreement or any term or condition thereof to any person except as required by law. The parties agree to treat this Agreement with confidentiality and to make the contents thereof known only to those employees who, by the nature of their jobs, are required to have such knowledge. This provision shall not be deemed to constitute an agreement by either party not to seek and obtain review of this Agreement by their respective legal counsel. In addition, in connection with the negotiation or performance of this Agreement, the parties may obtain proprietary information of the other party. The parties agree to maintain as confidential any information of the other party so obtained which is either specifically designated as confidential or which a reasonable person would understand to be confidential.

The provisions of this Article 3 shall survive termination of this Agreement for any reason unless disclosure is otherwise required by law.

| If to Haemonetics: | Mark Contardo<br>VP –Sales North American Blood Bank<br>Haemonetics Corporation<br>400 Wood Road<br>Braintree, Massachusetts 02184<br><br>cc: James O'Shaughnessy<br>Vice President and General Counsel<br>Haemonetics Corporation<br>400 Wood Road<br>Braintree, Massachusetts 02184 |
| --- | --- |
| If to Customer: | Attn: Dr. Anne Hale<br>Animal Blood Resources, Intl.<br>4983 Bird Drive<br>Stockbridge, MI 49285 |

## ARTICLE 4 -    MISCELLANEOUS

4.1    **No Waiver**. None of the terms of this Agreement shall be deemed to be waived by any party unless such waiver is in writing duly executed by the party to be charged with such waiver and such writing recites specifically that it is a waiver of the terms of this Agreement. The waiver by either party of any breach of any Agreement, warranty or covenant contained in this Agreement shall not be construed to act as a waiver of any subsequent breach. The failure or delay of either party to exercise any right, power or remedy shall not operate as a waiver thereof, and all rights, powers and remedies shall continue in full force and effect. All rights, powers and remedies of both parties provided for in this Agreement are cumulative and non-exclusive, except as otherwise expressly provided.

4.2    **No Invalidity**. Unenforceability or invalidity of any one or more provision hereof shall not render any other provision herein contained unenforceable or invalid.

4.3    **Entire Agreement/Amendments**. This Agreement constitutes the entire agreement between the parties relating to the subject matter herein and all prior proposals, understandings, course of conduct and writings by and between the parties and relating to the subject matter herein are superseded.    In the event of a conflict between the provisions of any other agreement or document, including without limitation any purchase order, and the terms of this Agreement, the terms of this Agreement shall govern and the terms of this Agreement may only be amended in a writing duly executed by all parties to this Agreement with specifically states that it is an amendment to this Agreement.

4.4    **Notices**. Any notice required or contemplated by this Agreement and any request made by Customer shall be effective only if such notice or request is in writing, duly delivered, if delivered in person or sent by telegram, telex or facsimile transmission or sent by registered mail, as follows:

4.5    **Arbitration**. Any claim or dispute arising out of, or relating to, this Agreement or any alleged breach thereof, including without limitation any claim concerning the interpretation or validity of this Agreement shall be determined, solely and exclusively, by arbitration upon written demand by a party. Each party shall bear its own expenses of the arbitration, including its own attorneys' fees, unless the arbitration award states that the expenses shall be otherwise assessed. Notwithstanding the foregoing, in the event both parties hereto are named as defendants by an arms length third party plaintiff asserting a claim against both Haemonetics and Customer, then and in such event, either Haemonetics or Customer may seek the resolution of their respective rights and obligations, arising from such claim in said proceedings.

4.6    **Governing Law:** This Agreement and all transactions contemplated by this Agreement shall be governed by, and construed and enforced in accordance with the laws of the Commonwealth of Massachusetts.

4.7    **Force Majeure Events**. Failure of either party to perform its obligations under this Agreement shall not subject such party to any liability to the other party if such failure is caused by any cause beyond the reasonable control of such nonperforming party, including, but not limited to, acts of God, fire, explosion, flood, drought, war, riot, sabotage, terrorism, embargo, strikes or other labor trouble or a national health emergency.