1

2

3

4

5

6

7

8             IN THE UNITED STATES DISTRICT COURT

9           FOR THE EASTERN DISTRICT OF CALIFORNIA

10   ANIMAL BLOOD BANK, INC., a
     California corporation, et al.,
11
                 Plaintiffs,              No. 2:10-cv-02080 KJM KJN
12
          v.
13
     ANNE S. HALE, an individual,
14
                 Defendant.               FINDINGS AND RECOMMENDATIONS
15   _____/

16              Plaintiffs filed a Motion for Default Judgment (the "Motion") on September 20,

17   2012.[1]  (Mot. for Default J., Dkt. No. 74.)  Defendant Anne S. Hale ("defendant") did not file any

18   written opposition to the Motion.

19              Plaintiffs seek default judgment upon claims for: (1) breach of a "Merger

20   Agreement," (2) breach of a "Shareholder Agreement," (3) breach of fiduciary duty arising from

21   defendant's role as a director and officer of plaintiff Animal Blood Bank, Inc. ("ABB"), (4)

22   misappropriation of trade secrets belonging to ABB, and (5) fraud.  (Mot. for Default J. at 10-

23   14.)  Plaintiffs' Motion includes a four-page list of damages figures and citations supporting

24   those figures (id. at 18-21), but the Motion did not specify the claim(s) giving rise to each

25

26   _____
          [1]   This case was referred to the undersigned pursuant to Eastern District of California
     Local Rule 302(c)(19), 28 U.S.C. § 636(b)(1), and pursuant to an Order issued August 21, 2012
     (Order, Dkt. No. 72).

1   damages figure.  Instead, plaintiffs prefaced the four-page list with the explanation that

2   "[p]laintiffs are able to demonstrate the following damages as a result of [Defendant] Hale's

3   misconduct."  (Id. at 18.)  The undersigned requested further clarification from plaintiffs

4   specifying which damages amounts arise from which claim(s).  (Dkt. No. 77.)  Plaintiffs timely

5   filed the requested supplemental briefing.  (Supp'l Br., Dkt. No. 78.)  Plaintiffs' motion and

6   supporting declarations, exhibits, and supplemental briefing are currently pending before the

7   undersigned.  (Dkt. Nos. 74, 78; Declaration of Patricia Kaufman ("Kaufman Decl."), Dkt. No.

8   74-3; Declaration of Marc Koenigsberg ("Koenigsberg Decl."), Dkt. No. 74-2.)

9           The court heard plaintiffs' motion for default judgment on its law and motion

10  calendar on November 1, 2012.  Attorneys Marc Koenigsberg appeared at the hearing on behalf

11  of plaintiffs.  Plaintiffs Michael and Patricia Kaufman also appeared at the hearing and gave

12  sworn testimony under penalty of perjury.  No appearance was made by or on behalf of

13  defendant.  For the reasons stated below, the undersigned recommends that plaintiffs' motion for

14  default judgment be granted, that judgment be entered in plaintiffs' favor, and that plaintiffs be

15  awarded $244,541.05 in damages, two permanent injunctions, $385,356.53 in attorneys' fees,

16  and $4,084.70 in litigation costs.

17  I.      BACKGROUND

18          A.      Summary Of Plaintiffs' Allegations

19          In general, this case arises out of the merger of defendant's company, MidWest

20  Animal Blood Services, Inc. ("MABS") with and into ABB.  The merger closed on July 16,

21  2008. (Compl. ¶ 11.)  Defendant was the president and chief executive officer of ABB from June

22  of 2008 until her resignation in May of 2010.  (Id. ¶ 5.)  Over the course of her relationship with

23  ABB, defendant allegedly breached her fiduciary duties to ABB, breached her contracts with

24  ABB and the Kaufmans, defrauded ABB and the Kaufmans, and misappropriated ABB's trade

25  secrets and proprietary information.  (Id. ¶¶ 43-74.)

26  ////

1         Relevant here, plaintiffs' Prayer For Relief requests damages, injunctive relief,

2   declaratory relief, and "attorneys' fees and costs."  (Compl. at 19-20.)

3         B.     <u>Relevant Procedural Background</u>

4         Plaintiffs filed their complaint on August 4, 2010.  (Compl., Dkt. No. 1.)

5         Defendant was served with process and filed an Answer and Counterclaims on

6   October 8, 2010.  (Dkt. No. 8.)  On August 3, 2011, plaintiffs' counsel filed a Notice of Filing

7   Bankruptcy as to defendant.  (Dkt. No. 44.)  On October 24, 2011, the district judge stayed this

8   action due to the pendency of defendant's bankruptcy proceeding.  (Dkt. No. 52.)

9         On February 10, 2012, the district judge lifted the bankruptcy stay.  (Dkt. No. 55.)

10  However, since the bankruptcy stay was lifted, defendant has not participated in this action,

11  despite multiple court orders directing her to do so.

12        Accordingly, after a hearing on a motion to compel on May 3, 2012, having

13  determined that neither defendant nor the Chapter 7 Bankruptcy trustee who "owns" defendant's

14  counterclaims intends to participate in this litigation, the undersigned entered an order to show

15  cause directing defendant to show cause why: (1) her answer should not be stricken; (2) her

16  default should not be entered; and (3) her counterclaims should not be dismissed with prejudice.

17  (<u>See</u> Order & Order to Show Cause ("OSC"), May 8, 2012, at 3-4, Dkt. No. 66.)  The

18  undersigned ordered the Chapter 7 bankruptcy trustee, Michael A. Mason, to similarly show

19  cause in regards to dismissal of defendant's counterclaims.  (<u>Id.</u> at 3.)  Neither defendant nor Mr.

20  Mason filed a response to the OSC.  Accordingly, the undersigned recommended that: (1) the

21  Clerk of Court be directed to strike defendant's answer to plaintiffs' complaint and enter

22  defendant's default; and (2) defendant's counterclaims be dismissed with prejudice.  (Dkt. No.

23  68.)  The OSC warned that defendant's and Mason's failures to respond to the OSC constituted

24  consent to these recommendations.  (<u>Id.</u> at 4.)

25        On July 2, 2012, the district judge issued an order dismissing defendant's

26  counterclaim in this action, pursuant to the parties' stipulation.  (Dkt. No. 70.)

On August 21, 2012, the district judge issued an order partially adopting the undersigned's Findings and Recommendations.[2]  (Order, Dkt. No. 72.)  Therein, the district judge directed the Clerk of the Court to: (a) strike defendant's answer (Dkt. No. 8) to plaintiffs' complaint; and (b) enter defendant's default with respect to plaintiffs affirmative claims.  (Order at 2.)

On October 3, 2012, the Clerk of the Court entered defendant's default pursuant to the district judge's order at Docket Number 72.  (Clerk's Cert. of Entry of Default, Dkt. No. 76.)

On September 20, 2012, plaintiffs filed the pending motion for default judgment against defendant and served a copy of the motion on defendant by U.S. mail and by overnight courier.  (Cert. of Serv., Sept. 20, 2012, Dkt. No. 74-1 at 28.)  A review of the court's docket reveals that defendant has not filed a response to the motion for default judgment.

## II.   LEGAL STANDARDS

Pursuant to Federal Rule of Civil Procedure 55, default may be entered against a party against whom a judgment for affirmative relief is sought who fails to plead or otherwise defend against the action.  See Fed. R. Civ. P. 55(a).  However, "[a] defendant's default does not automatically entitle the plaintiff to a court-ordered judgment."  PepsiCo, Inc. v. Cal. Sec. Cans, 238 F. Supp. 2d 1172, 1174 (C.D. Cal. 2002) (citing Draper v. Coombs, 792 F.2d 915, 924-25 (9th Cir. 1986)).  Instead, the decision to grant or deny an application for default judgment pursuant to Federal Rule of Civil Procedure 55(b)(2) lies within the district court's sound discretion.  Aldabe v. Aldabe, 616 F.2d 1089, 1092 (9th Cir. 1980).  In making this determination, the court considers the following factors:

---

[2]  The District Judge declined to adopt the portion of the Findings and Recommendations ("F&Rs") recommending dismissal of defendant's counterclaims, as that portion was rendered moot during the pendency of the F&Rs when the parties reached a stipulation to dismiss those counterclaims.  (Order, Dkt. No. 72 at 2 (citing the parties' Stipulation and Order, Dkt. Nos. 69-70).)

> (1) the possibility of prejudice to the plaintiff, (2) the merits of
> plaintiff's substantive claim, (3) the sufficiency of the complaint,
> (4) the sum of money at stake in the action[,] (5) the possibility of
> a dispute concerning material facts[,] (6) whether the default was
> due to excusable neglect, and (7) the strong policy underlying the
> Federal Rules of Civil Procedure favoring decisions on the merits.

Eitel v. McCool, 782 F.2d 1470, 1471-72 (9th Cir. 1986).  Default judgments are ordinarily disfavored.  Id. at 1472.

As a general rule, once default is entered, well-pleaded factual allegations in the operative complaint are taken as true, except for those allegations relating to damages. TeleVideo Sys., Inc. v. Heidenthal, 826 F.2d 915, 917-18 (9th Cir. 1987) (per curiam) (citing Geddes v. United Fin. Group, 559 F.2d 557, 560 (9th Cir. 1977) (per curiam)); accord Fair Housing of Marin v. Combs, 285 F.3d 899, 906 (9th Cir. 2002).  In addition, although well-pleaded allegations in the complaint are admitted by a defendant's failure to respond, "necessary facts not contained in the pleadings, and claims which are legally insufficient, are not established by default."  Cripps v. Life Ins. Co. of N. Am., 980 F.2d 1261, 1267 (9th Cir. 1992) (citing Danning v. Lavine, 572 F.2d 1386, 1388 (9th Cir. 1978)); accord DIRECTV, Inc. v. Hoa Huynh, 503 F.3d 847, 854 (9th Cir. 2007) (for default judgment purposes, a defendant is not held to admit facts that are not well-pled or conclusions of law); Abney v. Alameida, 334 F. Supp. 2d 1221, 1235 (S.D. Cal. 2004) ("[A] default judgment may not be entered on a legally insufficient claim.").

A party's default conclusively establishes that party's liability, but it does not establish the amount of damages.  Geddes, 559 F.2d at 560.  Upon moving for default judgment, the plaintiff is required to provide evidence of its damages, and the damages sought must not be different in kind or amount from those set forth in the complaint.  Amini Innovation Corp. v. KTY Intern. Mktg., 768 F. Supp. 2d 1049, 1054 (C.D. Cal. 2011) (citing Philip Morris USA, Inc. v. Castworld Prods., Inc., 219 F.R.D. 494, 498 (C.D. Cal. 2003).  When "proving-up" damages, admissible evidence (including witness testimony) supporting damage calculations, is usually

1  required.  Id.  "The court may conduct hearings or make referrals . . . when, to enter or effectuate

2  judgment, it needs to . . . determine the amount of damages."  Fed. R. Civ. P. 55(b)(2)(B).  Entry

3  of a default judgment for money is appropriate without a hearing if "the amount claimed is a

4  liquidated sum or capable of mathematical calculation."  Davis v. Fendler, 650 F.2d 1154, 1161

5  (9th Cir. 1981) (no hearing necessary when documents show that the judgment amount is based

6  upon a definite figure); Microsoft Corp. v. Nop, 549 F. Supp. 2d 1233, 1235-36 (E.D. Cal. 2008)

7  ("Where damages are liquidated (i.e., capable of ascertainment from definite figures contained in

8  the documentary evidence or in detailed affidavits), judgment by default may be entered without

9  a damages hearing.") (citing Dundee Cement Co. v. Howard Pipe & Concrete Prods., 722 F.2d

10  1319, 1323 (7th Cir. 1983)).  Unliquidated and punitive damages, however, require "proving up"

11  at an evidentiary hearing or through other means.  Nop, 549 F. Supp. 2d 1233, 1235-36.

12  III.    DISCUSSION

13         A.    Appropriateness of the Entry of Default Judgment Under the Eitel Factors

14                1.    Factor One: Possibility of Prejudice to Plaintiffs

15                The first Eitel factor considers whether the plaintiffs would suffer prejudice if

16  default judgment is not entered, and such potential prejudice to the plaintiffs militates in favor of

17  granting a default judgment.  See PepsiCo, Inc., 238 F. Supp. 2d at 1177.  Here, plaintiffs will

18  face continuing prejudice if the court does not grant a default judgment.  Absent the entry of a

19  default judgment, plaintiffs would be without another recourse for recovery.  Accordingly, the

20  first Eitel factor favors the entry of a default judgment.

21                2.    Factors Two and Three: The Merits of Plaintiffs' Substantive Claims and
                        the Sufficiency of the Complaint

22

23                The undersigned considers the merits of plaintiffs' substantive claims and the

24  sufficiency of the complaint together below because of the relatedness of the two inquiries.  The

25  undersigned must consider whether the allegations in the complaint are sufficient to state a claim

26  that supports the relief sought.  See Danning, 572 F.2d at 1388; PepsiCo, Inc., 238 F. Supp. 2d

1    at 1175.  California substantive law applies in this diversity action.  Intri–Plex Technol., Inc. v.

2    Crest Group, Inc., 499 F.3d 1048, 1052 (9th Cir. 2007) (citing Homedics, Inc. v. Valley Forge

3    Ins. Co., 315 F.3d 1135, 1138 (9th Cir. 2003)).

4            a.      Alleged Breaches Of Contract

5            The undersigned finds that the allegations in plaintiffs' complaint sufficiently

6    support the grant of relief on plaintiffs' breach of contract claims in the context of an application

7    for entry of default judgment.

8            "To succeed on a claim for breach of contract under California law, a plaintiff

9    must plead and prove: (1) the existence of a contract; (2) plaintiff's performance or excuse for

10   non-performance; (3) defendant's breach; and (4) damage to plaintiff resulting therefrom."

11   Craigslist, Inc. v. Naturemarket, Inc., 694 F. Supp. 2d 1039, 1059 (N.D. Cal. 2010) (citing

12   McKell v. Washington Mut., Inc., 142 Cal. App. 4th 1457, 1489 (2006)).

13           Here, plaintiffs allege breaches of two separate contracts: the Merger Agreement

14   and the Shareholder Agreement.  As described below, plaintiffs have sufficiently pled the

15   elements of a contract claim with respect to each agreement.

16           The relevant alleged events are as follows.  The Kaufmans and defendant formed

17   ABB in December 2002.  (Compl. ¶ 1.)  Defendant also had her own separate business, MABS.

18   (Id. ¶¶ 10-14.)  The Kaufmans and defendant wanted to merge MABS into ABB.  (Id.)

19   Accordingly, the Kaufmans and defendant signed a "Merger Agreement" on June 3, 2008.  (Id.)

20   The parties also entered into a "Shareholder Agreement" on June 3, 2008.  (Id. ¶ 18.)  The

21   Certificate of Merger was filed on June 4, 2008.  (Supp'l Br., Dkt. No. 78 at 1.)  Plaintiffs allege

22   that the merger of MABS into ABB "closed" on or about July 16, 2008.[3]  (Compl. ¶ 11.)

23   _____

24           [3]  While plaintiffs allege the merger "closed" on July 16, 2008 (Compl. ¶ 11), notably, the
     Merger Agreement leaves the closure date (i.e. the "Effective Date") blank.  Because plaintiffs'
25   well-pleaded allegations must be taken as true, however, July 16, 2008 is treated as the date the
     merger was complete.  During the hearing, Mr. Kaufman clarified that the parties behaved as if
26   the merger was complete on the date the Merger Agreement was signed.  Plaintiff's counsel also
     clarified that the Merger Agreement was fully executed and became binding on June 3, 2008,

i.      *The Merger Agreement*

In the Merger Agreement signed on June 3, 2008, defendant and MABS warranted that they had accurately disclosed MABS' financial picture to ABB.  (Id. ¶ 15; Exh. A to Compl.) Specifically, the Merger Agreement provided that the "financial information and related unaudited income statements, statements of shareholders' equity, and statements of cash flows of MABS, dated February 28, 2008, as provided to ABB, are accurate and complete in all material respects and fairly present the financial position of MABS as of the dates thereof . . ." (Id.)  The Merger Agreement also provided for attorneys' fees for any party prevailing in an action "as a result of breach of the Merger Agreement, or to establish, maintain, or enforce any right or remedy under the Merger Agreement."  (Id. ¶ 17; Exh. A to Compl. at ¶ 11.12.)  The Merger Agreement provides for recovery of costs in addition to attorneys' fees.  (Id.)  The Merger Agreement is governed by California law.  (Exh. A to Compl. at ¶ 11.2.)

Plaintiffs have pleaded factual allegations to support all four elements of a contract claim under California law with respect to the Merger Agreement.  See Craigslist, Inc., 694 F. Supp. 2d at 1059.  Plaintiffs have alleged the existence of the Merger Agreement and have alleged their performance of that agreement.  (Compl. ¶¶ 11, 44.)  Plaintiffs allege defendant's breaches of the Merger Agreement; namely, that defendant failed to accurately disclose all of MABS' liabilities prior to the merger in violation of that agreement and took on loans in MABS' name after the Merger Agreement was signed.[4]  (Id. ¶¶ 15-16, 43-45.)  Plaintiffs have also

notwithstanding future "administrative" events, such as Secretary of State filings, envisioned by the terms of that agreement.

[4]  The Merger Agreement contained provisions warranting: (1) that MABS had provided ABB with "accurate and complete" financial documents dated February 28, 2008, and that such documents "fairly present the financial position of MABS as of the dates thereof,"; (2) that MABS had "no undisclosed liabilities" other than "[l]iabilities incurred in the ordinary course of business consistent with past practices since the Financial Information Date, none of which has been adverse to the business of MABS . . ."; (3) that since February 28, 2008, there "has not been . . . any change in . . . assets, [or] financial condition. . .of MABS . . ."; and (4) that since February 28, 2008, there had not been "any indebtedness incurred by MABS for borrowed money or any commitment to borrow money entered into by MABS . . ."  (Mot. for Default J. at 11;

1  alleged resulting damages; namely, that ABB has had to take on MABS' undisclosed liabilities,

2  which has "depressed the value of ABB." (Id. ¶ 48.)  Plaintiffs alleged that their resulting

3  damages exceed $500,000. (Id. ¶ 38.)  Accordingly, plaintiffs have sufficiently alleged

4  defendant's breach of the Merger Agreement for default judgment purposes.

5                    ii.      The Shareholder Agreement

6            In the Shareholder Agreement, the Kaufmans and defendant bound themselves to

7  first obtain the unanimous approval of the other shareholders (namely, each other) prior to

8  spending more then $5,000 of ABB's funds in a single transaction or series of transactions with a

9  single vendor. (Id. ¶ 21; Exh. B to Compl. at 3-4.)  They also bound themselves to first obtain

10  the unanimous approval of the other shareholders (each other) prior to entering into contracts or

11  transactions between themselves and ABB. (Id.)  Plaintiffs allege that the Shareholder

12  Agreement is governed by California law. (Id. ¶ 22; Exh B. to Compl. at 6.)

13            Plaintiffs have pleaded factual allegations to support all four elements of a

14  contract claim under California law with respect to the Shareholder Agreement. See Craigslist,

15  Inc., 694 F. Supp. 2d at 1059.  Plaintiffs have alleged the existence of the Shareholder Agreement

16  and their own performance of it. (Compl. ¶ 18-23, 44.)  Plaintiffs allege defendant's breaches of

17  the Shareholder Agreement by alleging that defendant failed to obtain unanimous shareholder

18  approval before expending more than $5,000 of ABB's funds in a single transaction or series of

19  transactions, and by transacting more than $500 between herself (or her other companies) and

20  ABB without shareholder approval, among other improprieties. (Compl. ¶¶ 21, 25-27, 47; Exh.

21  B to Compl. at 3-4.)  Plaintiffs have also alleged resulting damages; namely, that ABB has had to

22  take on MABS' undisclosed liabilities, which has "depressed the value of ABB." (Id. ¶ 48.)

23  Plaintiffs alleged that their resulting damages exceed $500,000. (Id. ¶ 38.)  Accordingly,

24  plaintiffs have sufficiently alleged defendant's breach of the Shareholder Agreement for default

25  ───────────────

26  Exh. A to Compl. at 4, 6-7.)

1  judgment purposes.

2                 iii.    *Conclusion As To Contract Claims*

3            The undersigned concludes that the breach of contract allegations in plaintiffs'

4  complaint, taken as true for the purpose of evaluating the application for default judgment, justify

5  entry of default judgment insofar as the merits and sufficiency of those allegations are concerned.

6  Specifically, the undersigned concludes that plaintiffs have sufficiently alleged that defendant

7  breached the Merger Agreement and the Shareholder Agreement.  Accordingly, the second and

8  third <u>Eitel</u> factors favor the entry of default judgment as to the contract claims.

9                b.     <u>Alleged Breaches Of Fiduciary Duty</u>

10            The undersigned finds that the allegations in plaintiffs' complaint sufficiently

11  support the grant of relief on plaintiffs' fiduciary duty claim in the context of an application for

12  entry of default judgment.

13            To allege a claim for breach of fiduciary duty under California law, a plaintiff

14  must allege: "(1) existence of a fiduciary relationship; (2) breach of the fiduciary duty; and (3)

15  damage proximately caused by that breach."  <u>Lane v. Vitek Real Estate Industries Group</u>, 713 F.

16  Supp. 2d 1092, 1104 (E.D. Cal. 2010) (citing <u>Roberts v. Lomanto</u>, 112 Cal. App. 4th 1553, 1562

17  (2003)).  A director of a corporation has a fiduciary relationship with the corporation and owes

18  the corporation a fiduciary duty.  <u>Credit Bureau Connection, Inc. v. Pardini</u>, 726 F. Supp. 2d

19  1107, 1120 (E.D. Cal. 2010).

20            Here, plaintiffs have pleaded factual allegations to support claims for defendant's

21  breaches of fiduciary duties to ABB.  Plaintiffs have alleged that defendant's role as a director

22  and officer of ABB gave rise to her fiduciary duty to ABB.  (Compl. ¶ 50.)  Plaintiffs have also

23  alleged that defendant failed to accurately inform ABB about MABS' liabilities in advance of the

24  merger, that defendant continued with a "lyophilized platelet project" without ABB shareholder

25  approval, that defendant caused ABB to pay more than $5,000 to her other company, Trianco

26  LLC, without unanimous ABB shareholder approval, and that defendant improperly caused ABB

1   to take on significant liabilities, among other improprieties.  (Id. ¶ 51.)  Plaintiffs have also

2   alleged damages resulting from these breaches of duty; namely, that defendant's breaches of

3   fiduciary duty to ABB has "depressed the value of ABB," among other damages.  (Id. ¶ 48.)

4   Plaintiffs also alleged that their resulting damages exceed $500,000.  (Id. ¶ 38.)

5         The undersigned concludes that the breach of fiduciary duty allegations in

6   plaintiffs' complaint, taken as true for the purpose of evaluating the application for default

7   judgment, justify entry of default judgment insofar as the merits and sufficiency of those

8   allegations are concerned.  Specifically, the undersigned concludes that plaintiffs have

9   sufficiently alleged that defendant breached fiduciary duties to ABB.  Accordingly, the second

10   and third Eitel factors favor the entry of default judgment as to plaintiffs' fiduciary duty claims.

11             c.      Alleged Misappropriation Of Trade Secrets

12         The undersigned finds that the allegations in plaintiffs' complaint sufficiently

13   support the grant of relief on plaintiffs' trade secret misappropriation claim in the context of an

14   application for entry of default judgment.

15         To allege a claim for misappropriation of trade secrets under California law, a

16   plaintiff must allege: (1) they owned trade secrets; (2) that the defendant acquired, disclosed, or

17   used those trade secrets through improper means; and (3) the defendant's actions damaged the

18   plaintiff.  Cytodyn, Inc. v. Amerimmune Pharmaceuticals, Inc., 160 Cal. App. 4th 288, 297

19   (2008).

20         Here, plaintiffs have pleaded factual allegations to support claims for defendant's

21   misappropriation of ABB's trade secrets.  Plaintiffs have alleged that ABB possessed two

22   proprietary lists, a customer list and an animal blood donor list, that amounted to trade secrets.

23   (Compl. ¶¶ 60-63.)  Plaintiffs have also alleged that defendant took those lists and turned them

24   over to ABB's competitor.  (Id. ¶¶ 62-63.)  Plaintiffs have alleged that defendant's actions caused

25   actual damages to plaintiffs, including causing ABB to no longer be the "primary supplier" of

26   blood to some of its clients.  (Id. ¶¶ 63-64, 66-67.)  Plaintiffs have also alleged that defendant's

1   actions were willful and malicious.  (Id. ¶ 65.)

2          The undersigned concludes that the trade secret misappropriation allegations in

3   plaintiffs' complaint, taken as true for the purpose of evaluating the application for default

4   judgment, justify entry of default judgment insofar as the merits and sufficiency of those

5   allegations are concerned.  Specifically, the undersigned concludes that plaintiffs have

6   sufficiently alleged that defendant misappropriated ABB's trade secrets in the form of a customer

7   list and animal blood donor list.  Accordingly, the second and third Eitel factors favor the entry

8   of default judgment as to plaintiffs' claims for trade secret misappropriation.

9          d.      Alleged Fraud

10          The undersigned finds that the allegations in plaintiffs' complaint sufficiently

11   support the grant of relief on plaintiffs' fraud claim in the context of an application for entry of

12   default judgment.

13          "Under California law, the indispensable elements of a fraud claim include (1) a

14   false representation, (2) knowledge of its falsity, (3) intent to defraud, (4) justifiable reliance, and

15   (5) damages."  Craigslist, Inc., 694 F. Supp. 2d at 1060 (citing Vess v. Ciba–Geigy Corp. USA,

16   317 F.3d 1097, 1105 (9th Cir. 2003) (internal quotations and citation omitted).  Pursuant to Rule

17   9 of the Federal Rules of Civil Procedure, a plaintiff must allege a fraud claim with particularity.

18   Fed. R. Civ. P. 9(b).

19          Here, plaintiffs have pleaded factual allegations to support fraud claims against

20   defendant.  Plaintiffs have alleged that defendant made false representations to plaintiffs about

21   the extent of MABS' liabilities, the existence of a lease with Pitt County Development

22   Commission, and the fact that a grant was supposed to pay for the construction of a laboratory

23   clean room at the leased premises.  (Compl. ¶¶ 69-70.)  Plaintiffs have alleged that defendant

24   knew these and other representations were false.  (Id. ¶¶ 71-72.)  Plaintiffs also alleged that

25   defendant increased MABS' liabilities "[a]fter the [m]erger" by secretly taking on an additional

26   loan from Independent Bank in MABS' name.  (Id. ¶ 70(b).)  Plaintiffs have alleged that they

justifiably relied on defendant's representations about MABS' liabilities, the lease, the clean room's being funded by a grant, and other representations, and that in reliance upon these representations plaintiffs executed the Merger Agreement and made various improper payments that defendant directed ABB to pay.  (Id. ¶¶ 72-73.)  Plaintiffs have alleged resulting damages, including incurring improperly-incurred debts and obligations of MABS.  (Id. ¶ 73.)  Plaintiffs have also alleged that the intentional misrepresentations by defendant warrants an award of punitive damages.  (Id. ¶ 74.)

The undersigned concludes that the fraud allegations in plaintiffs' complaint, taken as true for the purpose of evaluating the application for default judgment, justify entry of default judgment insofar as the merits and sufficiency of those allegations are concerned.  Specifically, the undersigned concludes that plaintiffs have sufficiently alleged that defendant committed fraud.  Accordingly, the second and third Eitel factors favor the entry of default judgment as to plaintiffs' claims for fraud.

### 3. Factor Four: The Sum of Money at Stake in the Action

Under the fourth factor cited in Eitel, "the court must consider the amount of money at stake in relation to the seriousness of Defendant's conduct."  PepsiCo, Inc., 238 F. Supp. 2d at 1177; see also Philip Morris USA, Inc. v. Castworld Prods., Inc., 219 F.R.D. 494, 500 (C.D. Cal. 2003).  Here, plaintiffs seek a significant amount of damages.  However, plaintiffs' requests for contract damages are tailored to the defendant's specific breaches and resulting damages.  Under these circumstances, the undersigned concludes that this factor favors the entry of default judgment.

### 4. Factor Five: The Possibility of a Dispute Concerning Material Facts

The facts of this case are relatively straightforward, and plaintiffs have provided the court with well-pleaded allegations supporting their claim and a declaration of Ms. Kaufman (Kaufman Decl., Dkt. No. 74-3) in support of the allegations in the complaint.  Here, the court may assume the truth of well-pleaded facts in the complaint (except as to damages) following the

clerk's entry of default and, thus, there is no likelihood that any genuine issue of material fact exists.[5]  See, e.g., Elektra Entm't Group Inc. v. Crawford, 226 F.R.D. 388, 393 (C.D. Cal. 2005) ("Because all allegations in a well-pleaded complaint are taken as true after the court clerk enters default judgment, there is no likelihood that any genuine issue of material fact exists."); accord Philip Morris USA, Inc., 219 F.R.D. at 500; PepsiCo, Inc., 238 F. Supp. 2d at 1177.

     5.     Factor Six: Whether the Default Was Due to Excusable Neglect

     Upon review of the record before the court, the undersigned finds that the default was not the result of excusable neglect.  See PepsiCo, Inc., 238 F. Supp. 2d at 1177.  Defendant has had ample notice of this lawsuit.  As detailed above, defendant was served with process, filed an answer and asserted counter claims, and was afforded ample notice of this pending motion for default judgment.  Yet, defendant has not appeared in connection with the default judgment motion.  Indeed, defendant is absolutely aware of this pending case — after all, she previously filed an answer in this case — but actively chooses not to participate in her defense.[6]

     As noted in a prior Order to Show Cause, plaintiffs' status reports and their counsel's declarations very strongly indicate that defendant has ceased participating in this litigation and is avoiding or rebuffing plaintiffs' counsel's attempts to communicate with defendant.  (See generally Koenigsberg Decl., Dkt. No. 64; see also Pls.' Status Report, Mar. 13, 2012, at 1 & Ex. A, Dkt. No. 58; Pls.' Am. Status Report, Apr. 10, 2012, at 1, Dkt. No. 63; accord Order, Mar. 28, 2012, at 2 ("Plaintiffs have filed a report and represented that defendant

---

     [5]  Defendant's apparent willingness to cease her participation in this action further supports the conclusion that the possibility of a dispute as to material facts is minimal.

     [6]  On March 30, 2012, plaintiffs renewed their previously-filed motion to compel with leave of court, as the motion had been held in abeyance pending the lifting of a bankruptcy stay triggered by defendant's voluntary Chapter 7 bankruptcy petition in the U.S. Bankruptcy Court for the Eastern District of Michigan.  (See Order, Aug. 22, 2011, Dkt. No. 47; Order, Mar. 28, 2012, Dkt. No. 59.)  Neither defendant nor Mason opposed or otherwise responded to plaintiffs' renewed motion to compel.  The court heard plaintiffs' motion to compel on May 3, 2012.  No appearance was made by or on behalf of defendant or Mason.  As a result, and in light of plaintiffs' declarations, the court entered an Order to Show Cause.

refuses to participate further in this litigation.").)  Defendant's failure to appear at the hearing on plaintiffs' prior motion to compel and her failure to respond to the Order to Show Cause of May 8, 2012, further support the conclusion that defendant lacks any intention to defend herself in this litigation.  Moreover, defendant previously failed to respond to an order entered by the district judge, which warned defendant of the potential sanctions of default as to plaintiffs' claims and dismissal of defendant's counterclaims if defendant failed to participate in this case.[7]  (See Order, Mar. 28, 2012, at 2.)

Despite having ample notice of this lawsuit and of plaintiffs' intention to move for a default judgment, defendant has done nothing to defend herself.  Thus, the record suggests that defendant has chosen not to defend herself in this action, and not that the default resulted from any excusable neglect.  Accordingly, this Eitel factor favors the entry of a default judgment.

6.    Factor Seven: The Strong Policy Underlying the Federal Rules of Civil Procedure Favoring Decisions on the Merits

"Cases should be decided upon their merits whenever reasonably possible."  Eitel, 782 F.2d at 1472.  However, district courts have concluded with regularity that this policy, standing alone, is not dispositive, especially where a defendant fails to appear or defend itself in an action.  PepsiCo, Inc., 238 F. Supp. 2d at 1177; see also Craigslist, Inc., 694 F. Supp. 2d at 1061; ACS Recovery Servs., Inc. v. Kaplan, No. C 09-01304, 2010 WL 144816, at *7 (N.D. Cal. Jan. 11, 2010) (unpublished); Hartung v. J.D. Byrider, Inc., No. 1:08-cv-00960 AWI GSA, 2009 WL 1876690, at *5 (E.D. Cal. June 26, 2009) (unpublished).  Accordingly, although the undersigned is cognizant of the policy in favor of decisions on the merits—and consistent with existing policy would prefer that this case be resolved on the merits—that policy does not, by itself, preclude the entry of default judgment.

////

---

[7]  Mr. Mason, the Chapter 7 bankruptcy trustee who controlled defendant's now-dismissed counterclaims, has been similarly absent and non-responsive.

Upon consideration of the Eitel factors, the undersigned concludes that plaintiffs are entitled to a default judgment against defendant for claims of breach of contract, breach of fiduciary duty, misappropriation of trade secrets, and fraud, and the undersigned recommends that a such a default judgment be entered.  All that remains is the determination of the relief to which plaintiffs are entitled.

B.      Terms of the Judgment to Be Entered

After determining that a party is entitled to entry of default judgment, the court must determine the terms of the judgment to be entered.  Considering plaintiffs' briefing and the record in this case, including the exhibits and declarations submitted by plaintiffs, the undersigned concludes that plaintiffs are entitled to an award of $244,541.05, plus attorneys' fees in the amount of $385,356.53, plus costs in the amount of $4,084.70, as described below.

(1)     *Damages*

(a)     **The $45,000 Secret Loan**

Plaintiffs seek $45,000 arising from defendant's breach of the Merger Agreement and fraud.  (Supp'l Br. at 1.)  Plaintiffs allege that on June 19, 2008, before the merger "closed" but after the Merger Agreement was signed, defendant and MABS secretly borrowed $150,000 to pay off MABS' $105,000 line of credit, and that ABB may have succeeded to that debt but never received the additional $45,000.  (Id.)  ABB allegedly remains potentially liable to the bank for the loan to MABS.  (Id.)  The loan is due on June 19, 2013, and the bank has sued ABB in state court for failure to pay the loan.  (Id.)

While the above-described allegations reflect fraud by defendant and, in the alternative, might potentially reflect a breach of the Merger Agreement, the undersigned finds that plaintiffs have not proven they have actually incurred $45,000 in damages resulting from either claim.  As plaintiffs conceded during the hearing, ABB has not yet suffered any actual $45,000 in damage: ABB has not yet had to repay the loan to the bank, and has not yet been held liable in the state court action initiated by the bank.  Accordingly, at this time an award of

1  $45,000 to ABB for monies it *might* have to pay the bank would be purely speculative.  While

2  the undersigned sympathizes with plaintiffs' situation with respect to these claimed damages, the

3  undersigned cannot award damages that could potentially generate a windfall for plaintiffs, such

4  as, for instance, if the bank were to forgive the $45,000 debt or otherwise stop pursuing its action

5  against ABB.  Accordingly, the undersigned finds that plaintiffs have not adequately proven

6  resulting damages in the amount of $45,000.

7              (b)        **The C6 Flow Cytometer**

8              Plaintiffs seek $38,150 arising from defendant's breach of the Merger Agreement,

9  fraud, and breach of fiduciary duty.  (Supp'l Br. at 1.)  Before the merger "closed" on or about

10  July 16, 2008, defendant gave financial documents to ABB representing that MABS had

11  previously paid $38,150 for a "C6 Flow Cytometer" on April 2, 2008.  (Kaufman Decl. ¶ 5, Exh.

12  B.)  However, after the merger defendant later "arranged for ABB to pay" that same invoice

13  again on August 11, 2008.  (Id.)

14              The above-described allegations reflect defendant's breach of the Merger

15  Agreement, fraud, and breach of fiduciary duty to ABB.  Plaintiffs have adequately "proved up"

16  these damages.  (Id.)  Accordingly, the undersigned recommends that plaintiffs be awarded

17  damages in the amount of $38,150.

18              (c)        **Clean Room Construction**

19              Plaintiffs seek $16,843 arising from defendant's breach of fiduciary duty to ABB

20  and breach of the Shareholder Agreement.  (Supp'l Br. at 2.)  After the merger, and unbeknownst

21  to ABB, defendant entered into a lease for premises and signed the lease on behalf of another one

22  of her companies, Trianco LLC.  (Id.; Exh. D to Kaufman Decl. ¶ 7.)  To improve the leased

23  premises, she arranged for the construction of a "clean room."  The "clean room" cost $16,843 to

24  build, and defendant "caused" ABB to pay for it, thereby improving the premises for her other

25  company, Trianco LLC.  Plaintiffs were unaware they were paying for improvements on another

26  company's leased premises, and believed the "clean room" would be paid for with a grant.

1  (Kaufman Decl. ¶ 7.)

2        The above-described allegations reflect defendant's breach of fiduciary duty to

3  ABB and breach of the Shareholder Agreement.  Plaintiffs have adequately "proved up" these

4  damages.  (Exh. D to Kaufman Decl. ¶ 7.)  Accordingly, the undersigned recommends that

5  plaintiffs be awarded damages in the amount of $16,843.

6              (d)     **Trianco LLC's Rent**

7        Plaintiffs seek $9,000 arising from defendant's breach of fiduciary duty to ABB

8  and breach of the Shareholder Agreement.  (Supp'l Br. at 2.)  After the merger, and purportedly

9  on behalf of ABB, defendant signed a lease with Pitt County for rented premises, but put her

10 other company's name — Trianco LLC — on the lease.  (Kaufman Decl. ¶ 6.)  ABB paid the

11 monthly rent on this lease for a total of $9,000.  (Id.; Exh. C to Kaufman Decl.)

12       The above-described allegations reflect defendant's breach of fiduciary duty to

13 ABB and breach of the Shareholder Agreement.  Plaintiffs have adequately "proved up" these

14 damages.  (Exh. C to Kaufman Decl. ¶ 6.)  During the hearing, the undersigned questioned

15 plaintiffs regarding the value of ABB's potential use of the rented premises, if any,

16 notwithstanding what entities' names appear on the lease.  Mr. Kaufman represented that ABB

17 effectively made no use or minimal use of the leased premises.  Accordingly, plaintiffs have

18 adequately proven their actual resulting damages in the amount of $9,000, and the undersigned

19 recommends that plaintiffs be awarded these damages.

20              (e)     **Lyoplatelet Study**

21       Plaintiffs seek $107,270.50 arising from defendant's breach of the Merger

22 Agreement and Shareholder Agreement, breach of fiduciary duty, and fraud.  (Supp'l Br. at 2-3.)

23 Prior to the merger, defendant entered into a contract with East Carolina University for MABS'

24 participation in a "lyoplatelet study" and told plaintiffs that "grants" would be used to fund the

25 study.  (Kaufman Decl. ¶ 8.)  In reality, grants would not fund the study; instead, MABS had

26 contracted to pay $114,000 for the study itself.  (Id.) Defendant further "directed ABB staff" to

1   make payments for the study after the merger, and ABB did so.  (Id.)  Defendant also signed a

2   subsequent contract with the university in MABS' name after the merger.  (Id.)

3            The above-described allegations reflect defendant's breach of contract, breach of

4   fiduciary duty to ABB, and fraud.  Plaintiffs have adequately "proved up" these damages.  (Exh.

5   E to Kaufman Decl. ¶ 8.)  Accordingly, the undersigned recommends that plaintiffs be awarded

6   damages in the amount of $107,270.50.

7                    (f)      **Trianco LLC's "Consultants"**

8            Plaintiffs seek $71,000 arising from defendant's breach of the Shareholder

9   Agreement and breach of fiduciary duty.  (Supp'l Br. at 3.)  Defendant's Trianco LLC company

10  contracted with "consultants" Art Bode and Cheryl Binkley.  (Kaufman Decl. ¶ 9.)  Defendant

11  caused ABB to pay those consultants' salaries for five months even though the consultants were

12  technically under contract with defendant's company, not ABB.  (Id.)

13           The above-described allegations reflect defendant's breach of the Shareholder

14  Agreement and breach of fiduciary duty.  However, while it is clear that ABB paid the

15  consultants (Exh. F to Kaufman Decl. ¶ 9), it is not immediately clear whether ABB obtained any

16  benefits from the consultants notwithstanding the fact that the consultants lack of direct

17  contractual privity with ABB.  During the hearing, the Kaufmans represented that: Mr. Bode did

18  not possess a license needed for the project he was hired to consult for, the clean room was

19  required to launch that project but the clean room was never finished, the consultants provided no

20  written work product to ABB, and the consultants provided, at most, "minimal" handyman-type

21  services to ABB.  However, the Kaufmans conceded that the consultants did perform at least

22  *some* modicum of work for ABB's benefit.  Accordingly, in an abundance of caution, the

23  undersigned recommends a substantial reduction of the requested $71,000 and, because the

24  benefits plaintiffs received from the consultants certainly did not exceed half that amount, the

25  undersigned recommends that plaintiffs be awarded $35,500.

26  ////

1      (g)      **Payment To "Pet Blood Bank, Inc."**

2      Plaintiffs seek $8,439.20 arising from defendant's breach of the Shareholder

3    Agreement and breach of fiduciary duty.  (Supp'l Br. at 3.)  ABB paid an invoice for "Frozen

4    Plasma, Full Unit, 220 ML Average Volume @ $0.14/ML" to Pet Blood Bank Inc., a company

5    defendant "was in the process of becoming CEO while still employed at ABB."  (Kaufman Decl.

6    ¶ 10.)  Ms. Kaufman declared that this expenditure was "never approved" by ABB and that the

7    "purpose of this purchase is still unknown."  (<u>Id.</u>)  During the hearing, plaintiffs also confirmed

8    that they never received the invoiced frozen plasma.

9      The above-described allegations reflect defendant's breach of the Shareholder

10   Agreement and breach of fiduciary duty to ABB.  Plaintiffs have adequately "proved up" these

11   damages.  (Exh. G to Kaufman Decl. ¶ 10.)  Accordingly, the undersigned recommends that

12   plaintiffs be awarded damages in the amount of $8,439.20.

13     (h)      **ABB Directly Pays Defendant For "Rent"**

14     Plaintiffs seek $5,591.69 arising from defendant's breach of the Shareholder

15   Agreement and breach of fiduciary duty.  (Supp'l Br. at 3-4.)  Without obtaining plaintiffs'

16   unanimous consent, defendant directed ABB staff to issue a check for "rent" from ABB directly

17   to her and Trianco LLC.  (<u>Id.</u>; Kaufman Decl. ¶ 11.)

18     The above-described allegations reflect defendant's breach of the Shareholder

19   Agreement and breach of fiduciary duty to ABB.  Plaintiffs have adequately "proved up" these

20   damages.  (Exh. H to Kaufman Decl. ¶ 11.)  Accordingly, the undersigned recommends that

21   plaintiffs be awarded damages in the amount of $5,591.69.

22     (i)      **ABB Pays Defendant's Patent/IP Attorneys**

23     Plaintiffs seek $1,769.74 arising from defendant's breach of fiduciary duty to

24   ABB.  (Supp'l Br. at 4.)  Without obtaining approval from plaintiffs before using ABB funds to

25   pay a personal expense, defendant directed ABB to pay her personal lawyers.  (<u>Id.</u>; Kaufman

26   Decl. ¶ 12.)

1    The above-described allegations reflect defendant's breach of fiduciary duty to

2    ABB.  Plaintiffs have adequately "proved up" these damages.  (Exh. I to Kaufman Decl. ¶ 12.)

3    Accordingly, the undersigned recommends that plaintiffs be awarded damages in the amount of

4    $1,769.74.

5                    (j)      **ABB Pays Defendant's Accountants**

6    Plaintiffs seek $3,798 arising from defendant's breach of fiduciary duty to ABB.

7    (Supp'l Br. at 4.)  Without obtaining approval from plaintiffs before using ABB funds to pay a

8    personal expense, defendant directed ABB to pay her personal accountants.  (Id.; Kaufman Decl.

9    ¶ 13.)

10    The above-described allegations reflect defendant's breach of fiduciary duty to

11    ABB.  Plaintiffs have adequately "proved up" these damages.[8]  (Exh. J to Kaufman Decl. ¶ 13.)

12    Accordingly, the undersigned recommends that plaintiffs be awarded damages in the amount of

13    $3,798.

14                    (k)      **ABB Pays Forensicon To Image Defendant's Laptop**

15    Plaintiffs seek $18,178.92 arising from defendant's breach of fiduciary duty to

16    ABB.  (Supp'l Br. at 4-5.)  Plaintiffs seek to recover monies they paid to recover information

17    from defendant's laptop after learning of her misconduct.  (Id.)

18    At first blush, this figure seems to be better construed as a litigation cost rather

19    than as "damages" clearly arising from a breach of duty.  After all, plaintiffs' need for help

20    navigating defendant's laptop does not clearly implicate "fiduciary duty" issues.  However, while

21    plaintiffs confirmed that they used Forensicon in part to assist with this litigation (Kaufman Decl.

22    ¶ 15), during the hearing plaintiffs further explained that defendant's breaches of fiduciary duties

23    necessitated the ouster of defendant from ABB's business dealings, thereby requiring plaintiffs to

24    incur the necessary expense of obtaining immediate use of her laptop so they could continue

25    _____

26    [8]  While the evidence of these damages reflects that "Animal Blood Resources Int'l" paid
the invoice, during the hearing plaintiffs confirmed that this entity is simply a "d/b/a" for ABB.

ABB's business operations.  On these unique facts, monies paid to Forensicon represent actual

damages arising from plaintiffs' breaches of fiduciary duties.

The above-described allegations reflect defendant's breach of fiduciary duty to

ABB.  Plaintiffs have adequately "proved up" these damages.  (Exh. L to Kaufman Decl. ¶ 15.)

Accordingly, the undersigned recommends that plaintiffs be awarded damages in the amount of

$18,178.92.

(2)    *Permanent Injunctions*

As described above, plaintiffs allege that defendant stole their customer list and

their animal donor list and, to plaintiffs' detriment, passed them to competing businesses.

(Compl. ¶¶ 60-67; Mot. for Default J. at 21-22.)

Plaintiffs seek a first Permanent Injunction "enjoining Hale, her agents, servants

and employees, and all persons acting under, in concert with, or for her from making any false

representations [about plaintiffs] to . . . [sic] any persons or businesses Hale knows to have

business relationships with Plaintiffs [in ABB's industry]."[9]  (Mot. for Default J. at 21-22.)

Plaintiffs also seek a second Permanent Injunction requiring "Hale, her agents,

servants and employees, and all persons, acting under, in concert with, or for her: (a) to refrain

from continuing the misappropriation of ABB's trade secrets by ongoing use or disclosure of

ABB's lists; and (b) to return all copies of ABB's trade secrets, as described in the Complaint."

(Id.)

This requested injunctive relief is substantially identical to that requested in the

Complaint, and the undersigned recommends that both Permanent Injunctions be granted.  (See

Compl., Prayer for Relief ¶¶ 5-6.)  "'The requirements for the issuance of a permanent injunction

---

[9]  The undersigned has added the qualifying phrase "about plaintiffs" to plaintiffs' first proposed Permanent Injunction.  Permanent injunctive relief prohibiting *all* false statements about *any* topic would be an unreasonably broad restriction on defendant's speech.  The undersigned has also added the qualifier "in ABB's industry" to plaintiffs' first proposed Permanent Injunction.  Permanent injunctive relief extending beyond ABB's industry (i.e., the animal blood industry) would be an unreasonably broad restriction.

1    are (1) the likelihood of substantial and immediate irreparable injury, and (2) the inadequacy of

2    remedies at law.'"   Montana v. BNSF Ry. Co., 623 F.3d 1312, 1317 n.3 (9th Cir. 2010) (quoting

3    G.C. and K.B. Invs., Inc. v. Wilson, 326 F.3d 1096, 1107 (9th Cir. 2003)).   Additionally,

4    "[a]ctual success on the merits of a claim is required for a permanent injunction."   Avery

5    Dennison Corp. v. Sumpton, 189 F.3d 868, 881 (9th Cir. 1999); see also Amoco Prod. Co. v.

6    Village of Gambell, 480 U.S. 531, 546 n.12 (1987) ("The standard for a preliminary injunction is

7    essentially the same as for a permanent injunction with the exception that the plaintiff must show

8    a likelihood of success on the merits rather than actual success.").   The court must also consider

9    the balance of equities and the public interest.   See Winter v. Natural Resources Def. Council,

10   Inc., 555 U.S. 7, 32 (2008) ("The factors examined above — the balance of equities and

11   consideration of the public interest—are pertinent in assessing the propriety of any injunctive

12   relief, preliminary or permanent.").

13           Here, plaintiffs have demonstrated actual success on the merits.   As explained

14   above, plaintiffs are entitled to a default judgment on their claims for breach of contract, breach

15   of fiduciary duty, misappropriation of trade secrets, and fraud.   Consideration of a motion for

16   default judgment includes an evaluation of the sufficiency of plaintiffs' claims and the facts

17   supporting them.   Of course, such success is fully contingent on the adoption of these findings

18   and recommendations by the district judge assigned to this case.   However, for the purpose of

19   considering whether to recommend that a permanent injunction is issued, the undersigned

20   concludes that plaintiffs have demonstrated actual success on the merits.

21           Plaintiffs have also shown a likelihood of substantial and immediate irreparable

22   injury absent an injunction.   Plaintiffs will continue to suffer harm in the form of lost or

23   diminished customer relationships and lost or diminished relationships with their animal donors

24   if defendant continues to use ABB's lists in her competing businesses, and if defendant continues

25   in her apparent practice of directly and indirectly damaging ABB's ability to compete in the

26   animal blood industry.

1    Plaintiffs also lack an adequate remedy at law.  Aside from the injunction sought,

2    plaintiffs lack a civil remedy that would stop defendant from continuing to use plaintiffs' trade

3    secrets and/or disparaging plaintiffs in the eyes of current/potential clients and others in ABB's

4    industry.

5    In considering the balance of equities, the balance greatly tips in favor of

6    plaintiffs.  The harm to plaintiffs has been stated above.  Defendant would suffer no hardship or

7    harm if the court enjoined her and her agents from making false statements about plaintiffs to

8    current/potential clients and others in ABB's industry, and from ceasing use of plaintiffs' trade

9    secrets.

10   Finally, it is strongly in the public's interest that defendant be enjoined from

11   continuing efforts to harm ABB's ability to compete in the animal blood industry, either through

12   making false statements about plaintiffs to those in the industry or through using ABB's trade

13   secrets in the industry.  Accordingly, the undersigned recommends that both of plaintiffs'

14   requested permanent injunctions be entered.

15   (3)   *Punitive Damages For Willful Trade Secret Misappropriation*

16   Plaintiffs seek an undefined sum of punitive damages for "willful and malicious

17   misappropriation" of trade secrets.  (Supp'l Br. at 5-6.)  While plaintiffs do not cite the authority

18   for punitive damages in connection with willful and malicious trade secret misappropriation, the

19   relevant statute is California Civil Code § 3426.3.[10]  That section provides for "exemplary

20

21   [10]   According to California Civil Code § 3426.3,

22   (a) A complainant may recover damages for the actual loss caused by
     misappropriation. A complainant also may recover for the unjust enrichment

23   caused by misappropriation that is not taken into account in computing
     damages for actual loss.

24   (b) If neither damages nor unjust enrichment caused by misappropriation are
     provable, the court may order payment of a reasonable royalty for no longer

25   than the period of time the use could have been prohibited.

26   (c) *If willful and malicious misappropriation exists, the court may award*

damages" for malicious trade secret misappropriation, but caps those exemplary damages at "twice" the actual damages resulting from the misappropriation.  Plaintiffs did not attempt to prove up any damages resulting from the misappropriation of trade secrets.  Accordingly, any exemplary damages under this statute would be twice zero, which is zero.  Plaintiffs have not suggested a punitive damages figure.

Plaintiffs argue that defendant's refusal to participate in discovery prevented them from proving up damages from the misappropriations, and that punitive damages are appropriate even though the actual damages from the misappropriation may have been nominal.  (Supp'l Br. at 21-22 (citing Craigslist, Inc., 694 F. Supp. 2d at 1065 (in granting default judgment in a trademark case, the court suggested that punitive damages were appropriate where a defendant engaged in willful conduct and failed to participate in the litigation process, but ultimately *denied* punitive damages because plaintiffs were already entitled to significant liquidated and statutory damages).)

Plaintiffs have suggested that defendant's willful and malicious misappropriation "would be another basis to award ABB reasonable attorney's fees" in addition to the fees provision in the Merger Agreement.  (Supp'l Br. at 6.)  Plaintiffs essentially suggest that an attorney fee award under California Civil Code § 3426.4 could suffice in lieu of punitive damages, and this suggestion is well-taken.[11]  (Id.)  However, the undersigned finds that the actual award of punitive damages is unnecessary because the significant attorneys' fees plaintiffs

_____

*exemplary damages in an amount not exceeding twice any award made under subdivision (a) or (b).*

Cal. Civ. Code § 3426.3 (emphasis added).

[11]  "*If* a claim of misappropriation is made in bad faith, a motion to terminate an injunction is made or resisted in bad faith, or *willful and malicious misappropriation exists*, *the court may award reasonable attorney's fees and costs to the prevailing party*.  Recoverable costs hereunder shall include a reasonable sum to cover the services of expert witnesses, who are not regular employees of any party, actually incurred and reasonably necessary in either, or both, preparation for trial or arbitration, or during trial or arbitration, of the case by the prevailing party."  Cal. Civ. Code § 3426.4. (emphasis added).

have incurred will suffice to deter future misconduct by defendant.  Accordingly, for these reasons and for the reasons stated on the record during the hearing, the undersigned recommends that because plaintiffs' attorney fee award is likely to sufficiently deter future misconduct by defendant such that separate punitive damages should be denied as unnecessary to deter future misconduct.[12]  See Craigslist, 694 F. Supp. 2d at 1065 (denying punitive damages in light of hefty statutory and liquidated damage awards).

(4)    *Attorneys' Fees*

Plaintiffs seek recovery of $385,356.53 in attorneys' fees.  (Koenigsberg Decl. ¶ 19.)  The bases for a fee award are the attorney fees provision of the Merger Agreement and California Civil Code § 3426.4 (authorizing a fee award for willful misappropriation) as described above.[13]  Again, the fees provision in the Merger Agreement states that a party may recover attorney fees incurred "as a result of breach of the Merger Agreement, or to establish, maintain, or enforce any right or remedy under the Merger Agreement."  (Exh. A to Compl., ¶ 11.12.)

"A federal court sitting in diversity applies the law of the forum state regarding an award of attorneys' fees."  Kona Enters., Inc. v. Estate of Bishop, 229 F.3d 877, 883 (9th Cir. 2000).  Although California law "ordinarily does not allow for the recovery of attorneys' fees," California Civil Code § 1717 provides for an award of attorneys' fees where "the parties contractually obligate themselves" to so compensate each other.  Farmers Ins. Exch. v. Law Offices of Conrado Joe Sayas, Jr., 250 F.3d 1234, 1237 (9th Cir. 2001).  California law, the operative law of the Merger Agreement, provides that "[i]n determining litigation success for the

---

[12]  However, if there is any subsequent challenge in any forum to the award of the attorneys' fees and costs herein, the undersigned notes that the court would have awarded the same full amount as punitive damages as an alternative remedy.

[13]  By plaintiffs' own calculations, the attorneys' fees in this case actually exceed the actual damages alleged.  Plaintiffs allege actual damages of $335,041.05, and attorneys fees of $385,356.53, plus, as described below, *bankruptcy* attorney fees of $55,732.00.

1    purposes of identifying a prevailing party as defined by a contract, courts should respect

2    substance rather than form, and to this extent should be guided by equitable considerations." <u>Hsu</u>

3    <u>v. Abbara</u>, 9 Cal. 4th 863, 877 (1995).

4          Here, plaintiffs have successfully alleged several breaches of the Merger

5    Agreement, so they are entitled to reasonable attorneys' fees in this action.  Plaintiffs have also

6    successfully shown entitlement to fees pursuant to California Civil Code § 3426.4.  However,

7    plaintiffs' Motion did not address whether "apportionment" of attorneys' fees is appropriate or

8    possible in this case.

9          "Where a cause of action based on the contract providing for attorneys' fees is

10   joined with other causes of action beyond the contract, the prevailing party may recover

11   attorneys' fees under [Civil Code] section 1717 only as they relate to the contract action."

12   <u>Reynolds Metals Co. v. Alperson</u>, 25 Cal.3d 124, 129 (1979).  A litigant may not increase his

13   recovery of attorneys' fees by joining claims for which attorneys' fees are not recoverable to one

14   in which an award is proper.  <u>Id.</u>  Conversely, a "plaintiff's joinder of causes of action should not

15   dilute its right to attorneys' fees."  <u>Id.</u>  However, when claims for which attorneys' fees can be

16   awarded are closely related to claims for which there is no basis for awarding attorneys' fees, it

17   may be "'impracticable, if not impossible, to separate the multitude of conjoined activities into

18   compensable and noncompensable time units" and, thus, attorneys' fees need not be apportioned

19   for representation of an issue common to both a claim in which fees are proper and one in which

20   they are not allowed.  <u>Id.</u>; <u>Abdallah v. United Savings Bank</u>, 43 Cal. App. 4th 1101, 1111 (1996)

21   (citing <u>Fed–Mart Corp. v. Pell Enterprises, Inc.</u>, 111 Cal. App. 3d 215, 227 (1980); <u>Buena Vista,</u>

22   <u>LLC v. New Resource Bank</u>, No. C 10–01502 CW, 2011 WL 3794904, at *4-5 (N.D. Cal. Aug.

23   26, 2011) (unpublished) (holding that the defendant bank was entitled only to attorneys' fees for

24   the contract claims, but declining to segregate fees for contract claims from fees for non-contract

25   claims because the claims were "impossible to disentangle" given the plaintiff's style of pleading

26   them).  Apportionment of attorneys' fees between fees incurred on a contract claim and those

1  incurred on other claims is within the sound discretion of the court.  Abdallah v. United Sav.

2  Bank, 43 Cal. App. 4th 1101, 1111 (1996).

3        Here, plaintiffs seek default judgment on claims for breach of contract,

4  misappropriation of trade secrets, fraud, and breach of fiduciary duty.  As described above,

5  plaintiffs have compellingly argued their entitlement to recover attorneys' fees for representation

6  with respect to claims arising from the Merger Agreement, given its fees provision, and claims of

7  trade secret misappropriation, given California Civil Code § 3426.4.  However, plaintiffs'

8  briefing did not address the issue of apportionment of fees arising from representation with

9  respect to any other claims.  As a result, during the hearing the undersigned mentioned

10  potentially construing plaintiffs' attorneys' fees as a form of punitive damages; however, as

11  described above the undersigned has determined that the attorneys' fee award itself will likely

12  suffice to deter defendant's future misconduct such that a separate "punitive" damages award is

13  unnecessary.

14        In any event, it readily appears that fees plaintiffs incurred in litigating fiduciary

15  duty and fraud claims cannot clearly be separated from those incurred in connection with

16  litigating their contract and misappropriation claims.  In this particular case, the fiduciary duty

17  claims are closely related to the contract and misappropriation claims given defendant's

18  particular management and fiduciary roles in both ABB and MABS.  Plaintiffs' counsel's billing

19  entries (Exh. B to Koenigsberg Decl.) reflect fees for representation and discovery on issues

20  "common to" claims of breach of the Merger Agreement *as well as* plaintiffs' other claims.  See

21  Reynolds Metal, 25 Cal. 3d at 129-30 (awarding fees incurred on contract claims *and* on alter ego

22  claims because the case involved "representation on an issue common to both" claims).  A

23  review of counsel's billing entries and the court's docket reflects that fees were incurred in

24  connection with a motion for preliminary injunction and broad initial discovery with related

25  motion practice; such fees were thus incurred in litigating all of plaintiffs' "interrelated" claims.

26  See Abdallah, 43 Cal. App. 4th at 1111-12 (holding that court did not err in declining to

apportion fees given that contract and non-contract claims were "inextricably intertwined" and that it was "impracticable, if not impossible" to separate fees arising from each).  Given the similarities between the various claims in this case and the impracticality of determining which fees were incurred in connection with which claims, it is not practicable to apportion fees incurred litigating non-contract claims and non-misappropriation claims.  The undersigned finds that attorneys' fees need not be apportioned.

Plaintiffs seek recovery of $385,356.53 in fees arising from approximately 925 billable hours spent on this case by eight attorneys and one paralegal over a period of over two years.  (Mot. for Default J. at 26; Koenigsberg Decl. at 1-3.)  The amount of requested attorneys' fees incurred here at first blush seems remarkable given the relative lack of discovery and motion practice that occurred, and the fact that this case was stayed for a period of months.  The requested attorneys' fees are ultimately reasonable, however, given the complexities of this case, the multiple claims at issue, defendant's initially appearing in this case and filing an answer and counter-claims, defendant's refusal to participate in discovery, defendant's bankruptcy that delayed matters, and defendant's ultimate refusal to participate in the litigation.  Based on the undersigned's review of the billing entries of plaintiffs' attorneys (Exh. B to Koenigsberg Decl.) the undersigned concludes that plaintiffs' attorneys' fees are reasonable, that plaintiffs' suggested use of the <u>Laffey</u> matrix (adjusted to the Sacramento region) reflects a reasonable rate, and that plaintiffs have adequately "proved up" their fees by attaching fee statements and billing entries.  <u>See</u> <u>Morales v. City of San Rafael</u>, 96 F.3d 359, 363-64 (9th Cir. 1996); <u>Intel Corp. v. Terabyte Int'l</u>, 6 F.3d 614, 623 (9th Cir. 1983); <u>Laffey v. Northwest Airlines, Inc.</u>, 572 F. Supp. 354 (D.D.C.1983), aff'd in part, rev'd in part on other grounds, 746 F.2d 4 (D.C. Cir.1984); <u>Craigslist</u>, 694 F. Supp. 2d at 1067-68 (applying <u>Laffey</u> matrix and using federal locality pay differential to determine reasonable hourly rate in default judgment entry).

Accordingly, for these reasons and for the reasons stated on the record during the hearing, the undersigned recommends that plaintiffs be awarded the $385,356.53 they have

1  requested in attorneys' fees.

2         (5)    *Bankruptcy Attorney Fees*

3         Plaintiffs also seek an award of $55,732.00 in attorneys' fees incurred in

4  connection with defendant's bankruptcy action and related adversary proceeding.  (Mot. for

5  Default J. at 27.)  Plaintiffs state that their entitlement to such fees comes from a broad reading of

6  the fees provision in the Merger Agreement.  (Id.)  Again, the Merger Agreement fees provision

7  states that a party may recover attorney fees incurred "as a result of breach of the Merger

8  Agreement, or to establish, maintain, or enforce any right or remedy under the Merger

9  Agreement."  (Compl. ¶ 17; Exh. A to Compl. ¶ 11.12.)  Plaintiffs argue generally that they

10  needed to "assert and protect their rights under the Merger Agreement in Hale's bankruptcy

11  case."  (Id.)

12         While the Merger Agreement's fees provision is broad, it does not clearly

13  encompass fees incurred in connection with defendant's bankruptcy case.  Plaintiffs were (and

14  are) free to seek bankruptcy-related attorney's fees *in the bankruptcy action*.  Plaintiffs did not

15  provide any authority that would support the award of bankruptcy-related attorney fees in a

16  separate civil action.  Accordingly, for these reasons and for the reasons stated on the record

17  during the hearing, the undersigned recommends that plaintiffs' request for an award of

18  attorneys' fees incurred in defendant's bankruptcy action be denied.

19         (6)    *Costs*

20         The prayer for relief in the complaint and the application for default judgment

21  indicate that plaintiffs seek an award of "reasonable attorney's fees and costs."  (Compl. at 20.)

22  Plaintiffs now request $5,197.84 in costs.  (Motion at 22, 27.)  The Merger Agreement expressly

23  provides for recovery of "costs."  (Compl. ¶ 17.)  Aside from the Merger Agreement,  costs are

24  also recoverable pursuant to Federal Rule of Civil Procedure 54(d)(1) and 28 U.S.C. § 1920.[14]

25  _____

26         [14]  According to 28 U.S.C. § 1920,

Federal Rule of Civil Procedure 54(d)(1) provides that unless a federal statute, the Rules, or a court order provide otherwise, costs, other than attorneys' fees, should be awarded to a prevailing party.  Finally, litigation costs are recoverable in the default judgment context.  See e.g., Lasheen v. Loomis Co., No. CIV S-01-0227 LKK EFB, 2011 WL 846877, at * 9-10 (E.D. Cal. March 7, 2011) (unpublished) (awarding costs upon the granting of a motion for default judgment because "[u]nder Federal Rule of Civil Procedure 54(d)(1), a prevailing party may recover reasonable costs as enumerated in 28 U.S.C. § 1920.")

The undersigned has reviewed plaintiffs' counsel's declaration and attached chart reflecting the "costs" plaintiffs seek to recover.  (Exh. C to Koenigsberg Decl.)  These costs arise from deposition transcripts, process server fees, counsel's air fare and transportation to an out-of-town deposition, and counsel's hotel accommodations for the deposition.  (Id.)  Plaintiffs did not provide authorities confirming that each of these items is actually recoverable as a litigation "cost," and the undersigned therefore declines to construe counsel's $1,113.14 in transportation and hotel accommodations as recoverable "costs."  The remaining costs are reasonable and were adequately proved up.  (Id.)

Accordingly, for these reasons and for the reasons stated on the record during the hearing, the undersigned recommends that plaintiffs be reimbursed for their "costs" in the amount of $4,084.70.

---

A judge or clerk of any court of the United States may tax as costs the following:
(1) Fees of the clerk and marshal;
(2) Fees for printed or electronically recorded transcripts necessarily obtained for use in the case;
(3) Fees and disbursements for printing and witnesses;
(4) Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case;
(5) Docket fees under section 1923 of this title;
(6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

IV.     CONCLUSION

    For the foregoing reasons, IT IS HEREBY RECOMMENDED that:

    1.      Plaintiffs' Motion for Default Judgment (Dkt. No. 74) be granted.

    2.      Default judgment be entered against defendant Anne S. Hale for claims of breach of contract, breach of fiduciary duty, misappropriation of trade secrets, and fraud.

    3.      Plaintiffs be awarded actual damages as follows, for actual damages totaling **$244,541.05**:

        (a)     With respect to the alleged $45,000 arising from a secret loan obtained by defendant and MABS, that plaintiffs have not adequately proven resulting damages in the amount of $45,000, and that such damages be denied.

        (b)     With respect to ABB's payment for a C6 Flow Cytometer, that plaintiffs be awarded damages in the amount of $38,150.

        (c)     With respect to ABB's payment for construction of a "clean room" at premises leased by Trianco LLC, that plaintiffs be awarded damages in the amount of $16,843.

        (d)     With respect to ABB's payment of Trianco LLC's rent, that plaintiffs be awarded damages in the amount of $9,000.

        (e)     With respect to ABB's payment for the "Lyoplatelet Study," that plaintiffs be awarded damages in the amount of $107,270.50.

        (f)     With respect to ABB's payment of Trianco LLC's consultants, that plaintiffs be awarded $35,500, which is a substantial reduction to plaintiffs' requested $71,000, given that during the hearing the Kaufmans conceded that the consultants performed at least *some* modicum of "handyman" work for ABB's benefit, and given that the Kaufmans represented under oath that the benefits plaintiffs received from the consultants certainly did not exceed half of the requested $71,000.

        (g)  With respect to ABB's payment to the Pet Blood Bank, Inc., that plaintiffs be awarded damages in the amount of $8,439.20.

1   (h)   With respect to ABB's payment to defendant directly for "rent," that

2   plaintiffs be awarded damages in the amount of $5,591.69.

3   (i)   With respect to ABB's payment of defendant's personal patent/IP

4   attorneys, that plaintiffs be awarded damages in the amount of $1,769.74.

5   (j)   With respect to ABB's payment of defendant's personal accountants, that

6   plaintiffs be awarded damages in the amount of $3,798.

7   (k)   With respect to ABB's having to pay Forensicon to access defendant's

8   laptop to permit ABB to continue to conduct business following defendant's ouster from ABB,

9   the undersigned recommends that plaintiffs be awarded damages in the amount of $18,178.92.

10   4.   That both of plaintiffs' requested Permanent Injunctions be entered as

11   follows, including the court's bracketed modifications:

12   (a)   That Hale, her agents, servants and employees, and all persons acting

13   under, in concert with, or for her be enjoined from making any false

14   representations [about plaintiffs] to any persons or businesses Hale knows

15   to have business relationships with [p]laintiffs [in ABB's industry].

16   (b)   That Hale, her agents, servants and employees, and all persons, acting

17   under, in concert with, or for her shall: (A) refrain from continuing the

18   misappropriation of ABB's trade secrets by ongoing use or disclosure of

19   ABB's lists; and (B) return all copies of ABB's trade secrets, as described

20   in the Complaint.

21   5.   That because plaintiffs' attorney fee award is likely to sufficiently deter

22   future misconduct by defendant, separate punitive damages be denied as unnecessary to deter

23   future misconduct.

24   6.   That plaintiffs be granted an attorneys' fee award of **$385,356.53**, and that

25   attorneys' fees need not be apportioned in this case given the closely interrelated claims and

26   issues common to all claims described herein.

33

1    7.  That plaintiffs' request for $55,732 in attorneys' fees incurred in

2 connection with defendant's bankruptcy action be denied.

3    8.  That plaintiffs be reimbursed for their "costs" in the amount of **$4,084.70**.

4 This amount does not include "costs" in the form of counsel's air fare, transportation costs, and

5 hotel accommodations for an out-of-town deposition.

6    9.  The Clerk of Court be directed to enter judgment on the these terms and to

7 close this case.

8    These findings and recommendations are submitted to the United States District

9 Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within fourteen

10 days after being served with these findings and recommendations, any party may file written

11 objections with the court and serve a copy on all parties.  Id.; see also E. Dist. Local Rule 304(b).

12 Such a document should be captioned "Objections to Magistrate Judge's Findings and

13 Recommendations."  Any response to the objections shall be filed with the court and served on

14 all parties within fourteen days after service of the objections.  E. Dist. Local Rule 304(d).

15 Failure to file objections within the specified time may waive the right to appeal the District

16 Court's order.  Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d

17 1153, 1156-57 (9th Cir. 1991).

18    IT IS SO RECOMMENDED.

19 DATED:  November 16, 2012

20

21

22 KENDALL J. NEWMAN
  UNITED STATES MAGISTRATE JUDGE

23

24

25

26